United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**
No. 96-3027

| | | |
|---|---|---|
| Stanley D. Rabushka, ex rel. | * | |
| United States of America; | * | |
| Stanley D. Rabushka, | * | |
| | * | Appeal from the United States |
| Appellants, | * | District Court for the |
| | * | Eastern District of Missouri. |
| v. | * | |
| | * | |
| Crane Company, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  March 13, 1997

Filed: August 11, 1997

_____

Before WOLLMAN, MAGILL, and BEAM, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Stanley Rabushka's *qui tam* suit under the False Claims Act (FCA) against the Crane Company is before us for the third time.  After dismissing the first appeal, we reversed the district court's dismissal of Rabushka's suit and remanded the case for further proceedings.  United States *ex rel.* Rabushka v. Crane Co., 40 F.3d 1509 (8th

Cir. 1994) (Rabushka I).  Rabushka appeals from the district court's[1] judgment in favor of Crane.  We affirm.

# I.
## A.

This suit stems from Crane's spin-off of its subsidiary CF&I Steel Corp. to Crane shareholders in 1985.  CF&I was a profitable company until 1982, when it began suffering economic difficulties.  CF&I maintained for its employees the "CF&I Pension Plan" (the plan), a single-employer defined benefit plan.  Crane became concerned in the early 1980s about significant underfunding of the CF&I plan and Crane's potential liability for those unfunded pension obligations should CF&I file for bankruptcy.  Unable to find a buyer for CF&I, Crane spun off CF&I to Crane shareholders on May 28, 1985.

We summarized CF&I's financial condition at the time of the spin-off and its subsequent financial history in Rabushka I:

> At that time [1985] CF&I's unfunded pension liability was stated at approximately $46 million.  CF&I's financial condition worsened after the spinoff, in large part because of its burgeoning unfunded pension obligation.  In November 1990, with an estimated $140 million unfunded pension liability, CF&I filed for bankruptcy.  In March 1992, when the unfunded pension liability had grown to approximately $270 million, the Pension Benefit Guaranty Corporation [PBGC] terminated CF&I's pension plan and assumed those plan obligations that were protected by the Employee Retirement Income Security Act [ERISA], 29 U.S.C. §§ 1001 *et seq*.

40 F.3d at 1511.

---

[1]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

The PBGC terminated CF&I's plan on March 19, 1992, on the grounds that the plan had not met the minimum funding standards and would be unable to pay benefits when due and because the possible long-run loss to the PBGC could reasonably be expected to increase unreasonably if the plan was not terminated. The PBGC stated that it was terminating the plan "in order to protect the interests of the participants, to avoid any unreasonable deterioration of the financial condition of the Plan, and to avoid any unreasonable increase in the liability of the fund." At the time of the plan's termination, CF&I had not made any funding contributions since July 1990. Its contributions were $39 million in arrears; the plan had $35 million in assets and was paying out $18 million in benefits per year and would run out of money within two years; and the PBGC projected an increase in its exposure of $16 million per year if the plan was not immediately terminated.

**B.**

Rabushka, a former Crane shareholder, filed a four-count complaint asserting a *qui tam* action under the FCA, alleging that Crane spun off CF&I with the intent of wrongfully shifting its liability for CF&I's unfunded pension obligations to the PBGC.[2] Count I alleged that Crane submitted false or fraudulent pension benefit claims to the PBGC, or caused CF&I to do so, in violation of 31 U.S.C. § 3729(a)(1). Count II alleged that Crane submitted false statements to the PBGC, or caused CF&I to do so, in order to get false or fraudulent pension benefit claims paid by the PBGC, in violation of 31 U.S.C. § 3729(a)(2). Count III alleged a "reverse false claim," alleging that Crane made false statements, or caused CF&I to do so, to the PBGC to conceal Crane's obligation to pay money to the PBGC, in violation of 31 U.S.C. § 3729(a)(7). Count IV alleged that Crane conspired with CF&I and its employees to "defraud[] the PBGC by getting the PBGC to pay the false or fraudulent claims for unfunded, PBGC-insured benefits," in violation of 31 U.S.C. § 3729(a)(3). Rabushka's theory is that to

_____

[2]All references are to Rabushka's Third Amended Complaint.

avoid being saddled with CF&I's unfunded pension liability, Crane spun off CF&I, knowing that it was bankrupt and would not survive. Crane hoped that CF&I would survive long enough so that when it did go bankrupt--and the PBGC was forced to terminate CF&I's plan and assume its liabilities--Crane could not be held liable for those obligations.

When a single-employer plan such as CF&I's is terminated, the PBGC assumes responsibility for insured pension benefits. See 29 U.S.C.A. §§ 1322, 1361 (West 1985).[3] For transactions effective before January 1, 1986, the PBGC could assert a subrogation claim against an employer who failed to fund a pension plan, or any trade or business under common control with that employer at the time of termination. In those circumstances, the employer could be held liable for the plan's unfunded obligations or for thirty percent of the employer's net worth, whichever was less. See 29 U.S.C.A. §§ 1301(b)(1), 1362 (West 1985). Crane does not dispute that had the PBGC terminated CF&I's plan at the time of the spin-off, Crane could have been held liable for CF&I's unfunded pension liabilities.

In a notice-of-reportable-event letter dated June 28, 1985, the CF&I plan administrator reported the spin-off to the PBGC as a "transaction involving a transfer of . . . an ownership interest in a contributing sponsor," pursuant to 29 C.F.R. § 2515.23(a)(1)(ii) (1985).[4] Rabushka contends that Crane had a duty to report to CF&I's plan administrator that CF&I's spin-off was a transaction to implement CF&I's liquidation under 29 C.F.R. § 2615.22(a) (1985).[5] The CF&I plan administrator would then have been obligated to report this to the PBGC within thirty days, see 29 U.S.C.A.

---

[3]Due to various subsequent amendments, we cite to the 1985 versions of statutes and PBGC regulations applying to this case.

[4]Now codified at 29 C.F.R. § 4043.23 (1996).

[5]Now codified at 29 C.F.R. § 4043.22 (1996).

§ 1343(a) (West 1985); 29 C.F.R. § 2615 (1985),[6] and thus the PBGC would have known at the time of the spin-off or shortly thereafter that the transaction was really one to effect CF&I's liquidation, not the spinning-off of a viable company. Rabushka argues that had the PBGC known the true nature of the transaction and the true extent of CF&I's unfunded pension liabilities (also allegedly misrepresented), it would have immediately terminated CF&I's plan in order to avoid an increase in the PBGC's future liabilities and would have held Crane responsible for the unfunded liabilities. See 29 U.S.C.A. §§ 1342(a)(4), 1362 (West 1985). Thus, the alleged false claims in this case are the payment of the CF&I plan beneficiaries' claims out of the PBGC's funds rather than out of funds that Crane would otherwise have been required to advance to cover the plan's unfunded liabilities.

## C.

The district court granted Crane's motion for judgment on the pleadings on count III, which alleged that Crane could be held liable under the reverse false claims provision of the FCA, 31 U.S.C. § 3729(a)(7). The district court noted that the 1986 amendments to the FCA expressly allowed the government to assert reverse false claims, but concluded that the amendments did not apply retroactively to transactions occurring before their effective date.

The district court granted summary judgment to Crane on counts I, II, and IV. The court concluded that Crane did not prepare or submit any documents to the PBGC about CF&I's plan; that Crane had no duty under ERISA to report any information to the PBGC or to pay for CF&I's unfunded pension liabilities; that Crane could not be held liable under "predecessor liability" or "sham transaction" theories advanced by Rabushka; and that there was no basis for piercing CF&I's corporate veil and holding

---

[6]Now codified at 29 C.F.R. § 4043.3 (1996).

Crane liable as an alter ego corporation. The court denied Rabushka's subsequent Rule 59(e) motion to alter or amend the judgment.

## II.

We review a grant of summary judgment de novo, applying the same standard as the district court: whether the record, viewed in a light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Earnest v. Courtney, 64 F.3d 365, 366-67 (8th Cir. 1995). We recently explained the standard the non-moving party must meet to avoid summary judgment:

> After the moving party points out the absence of evidence to support the nonmoving party's case, the nonmoving party "must advance specific facts to create a genuine issue of material fact for trial." Rolscreen Co. v. Pella Prods., Inc., 64 F.3d 1202, 1211 (8th Cir. 1995); see Celotex [Corp. v. Catrett, 477 U.S. 317, 323-25 (1986)]. A genuine issue of material fact exists if the evidence is sufficient to allow a reasonable jury to return a verdict for the nonmoving party. See Anderson[v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)]. However, the mere existence of a scintilla of evidence in favor of the nonmoving party's position is insufficient to create a genuine issue of material fact. See Anderson, 477 U.S. at 252; Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 81-82 (8th Cir. 1996), cert. denied, 117 S. Ct. 1694 (1997); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (explaining that nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts"). After adequate time for discovery and upon proper motion, a court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

In re: Temporomandibular Joint (TMJ) Implants Products Liability Litigation, 113 F.3d 1484, 1492 (8th Cir. 1997).

## A.

We affirm the district court's grant of summary judgment to Crane on Counts I, II, and IV for a reason different from those relied upon by the district court.  See Allstate Financial Corp. v. United States, 109 F.3d 1331, 1333 (8th Cir. 1997).

Crane moved for summary judgment on two grounds, arguing that the PBGC would not have involuntarily terminated the CF&I Pension Plan at any relevant time, irrespective of any statement or nondisclosure by Crane, and that Crane did not make or cause to be made any false statement to the PBGC.  The district court did not reach Crane's first ground and instead based its decision on the second, stating that:

> The Court declines to reach this [the first] issue for two reasons.  First, there is a significant question as to whether the PBGC's Fed. R. Civ. P. 30(b)(6) corporate designee, Royal [Dellinger], was authorized to provide opinions on this subject by way of affidavit after his deposition.[7]  Second, Defendant fails to explain how a ruling in its favor on this issue would entitle it to summary judgment as a legal matter.  Defendant frames the issue as one of causation.  As Plaintiffs correctly note, however, proof of causation of damages is relevant only to recovery of compensatory damages.  The absence of such proof does not preclude the assessment of penalties, attorney's fees, and costs.  See Rex Trailer Co., Inc. v. U.S., 350 U.S. 148, 153 n.5 (1956); U.S. ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991).

(Memorandum and Order at 39 n.9 (May 30, 1996)).

On appeal, Crane again contends that its alleged nondisclosures were immaterial to and had no influence on the PBGC, arguing that

---

[7]We do not consider Dellinger's affidavit in our discussion and need not discuss it further, nor do we need to discuss arguments raised in Rabushka's Fed. R. App. P. 28(j) letter, because they relate only to Dellinger's affidavit.

the PBGC's decision not to terminate the CF&I Plan was in no way dependent upon disclosures or nondisclosures by CF&I or Crane. Therefore, the alleged misrepresentations and nondisclosures attributed to Crane were indisputably not a cause of the PBGC's decision not to terminate the CF&I Plan prior to March 19, 1992. . . . [The issue] does not relate to "causation of damages". [It] relates to Rabushka's premise-- essential to all counts of his complaint--that Crane either (i) caused false or fraudulent claims to be filed with the PBGC or (ii) evaded its obligation to indemnify the PBGC by *causing* the PBGC not to terminate the CF&I Pension Plan prior to March 19, 1992.

Although Rabushka argues that the facts surrounding this contention are in dispute, he conceded at oral argument that he had no evidence that the PBGC would have terminated the plan in 1985. He also conceded that he would have to prove at trial that the PBGC would have terminated the plan in 1985 had it known the information Crane allegedly wrongfully withheld.

This issue goes to the very heart of Rabushka's claims. If Rabushka cannot show that the PBGC would have terminated CF&I's pension plan in 1985 had it known that the spin-off was a transaction to implement CF&I's liquidation, then there is no false claim because the PBGC's payment of CF&I's unfunded pension liabilities would have occurred regardless of Crane's actions.

### B.

To prove his claims under the FCA, Rabushka must show that a claim for payment from the government was made and that the claim was "false or fraudulent." See 31 U.S.C. § 3729(a)(1), (2), & (3); United States *ex rel.* Glass v. Medtronic, Inc., 957 F.2d 605, 608 (8th Cir. 1992). Summary judgment is appropriate if the plaintiff lacks sufficient evidence to show that any false or fraudulent claims have been made. See Wang v. FMC Corp., 975 F.2d 1412, 1420-21 (9th Cir. 1992).

Royal Dellinger, who at the time of his resignation in September of 1989 was the PBGC's principal deputy executive and chief negotiator, gave the following deposition testimony. During the relevant time period, the PBGC's policy was not to involuntarily terminate pension plans unless they were unable to pay benefits when due, or if the plan was abandoned by the employer. Dellinger testified that "[t]he [PBGC] would have been most concerned with the plan's ability to pay its benefits on a timely basis." The PBGC's policy regarding settlements or compromises of a plan's pension obligations prior to termination was that it was done only in those cases where it was clear that termination was inevitable; inevitable termination meant either the potential inability to pay benefits when due or potential abandonment of a plan. Dellinger testified that CF&I's spin-off did not warrant an involuntary termination of the CF&I pension plan, that the spin-off described in the notice of reportable event did not constitute a liquidation for purposes of the notice of reportable event regulations, and that he was not aware of any basis on which the spin-off could be characterized as a liquidation. Dellinger also testified that the PBGC would not terminate a plan based on the conclusion that in some subsequent year the plan would likely not be able to pay benefits when due, because a termination would require a finding that the plan would not be able to pay benefits in the immediate future, which was less than a year.

Dellinger also testified as follows:

Q:    In 1985, if the PBGC had determined that it was inevitable that CF&I would be liquidated but that that liquidation would not occur for more than a year, would it have terminated the pension plan?

A:    No, it wouldn't have.

Q:    And if the PBGC had determined in 1985 that CF&I had been unable to make funding contributions to the plan in the future, more than a year in the future, would it have terminated the pension plan?

A:    No, it wouldn't have.

Q:    And if the PBGC had determined in 1985 that it was inevitable that CF&I would be unable to make benefit payments when due, but that that event would not occur for more than a year, would it have terminated the pension plan?

A:    No, it wouldn't have.

In 1987, CF&I Chairman Crocker Nevin sought termination of CF&I's plan by the PBGC and reported the details of CF&I's current and future financial condition to the PBGC, including the fact that its pension plan was underfunded by $120 million. Dellinger testified that the PBGC did not grant CF&I's termination request because its request was not consistent with the PBGC's policies at the time and that negotiation of a settlement with CF&I prior to termination of its pension plan would also have been inconsistent with PBGC policy. In 1985, CF&I's pension plan had assets of approximately $45 million. Between 1983 and 1985, it was paying out $5 to $6 million per year in benefits. The parties do not dispute that CF&I was always able to pay benefits due until the plan's termination.

In opposition, Rabushka points to Dellinger's further responses:

Q:    If CF&I had stated in the notice of reportable event, the June 28th [1985] letter, that the spinoff constituted a liquidation of the company, would the PBGC have terminated the plan?

A:    I don't believe it would have taken action based on that assertion. It clearly would have reviewed the case differently.

Q:    And how would it have done so?

A:    I think the agency would have initiated an effort to find out if in fact a liquidation was going to occur.

Rabushka also points to the PBGC's 1992 termination of the plan, noting that the plan was terminated even though it could still pay benefits as they came due in 1992. Rabushka argues that this shows that had the PBGC known the spin-off was a liquidation of CF&I it would have terminated the plan in 1985, even if the plan was able to pay benefits due at that time.

Thus, although Rabushka may have a scintilla of evidence in support of his theory, he does not have sufficient evidence to avoid summary judgment. See In re: TMJ, 113 F.3d at 1492. Crane's evidence--the PBGC's policy against involuntarily terminating a plan when it had sufficient assets to pay current benefits, the CF&I plan's ability to pay benefits as they came due in 1985, the fact that the spin-off did not warrant an involuntary termination in 1985, the PBGC's subsequent refusal to terminate the plan in 1987, and the fact that the plan would not have been terminated in 1985 even if the PBGC determined that CF&I's liquidation or inability to make benefit payments was inevitable so long as those events did not occur for more than one year--overwhelmingly establishes that the PBGC would not have terminated CF&I's plan in 1985.

We do not find persuasive Rabushka's speculation, based solely on the PBGC's 1992 termination of CF&I's plan and in direct contradiction of Dellinger's testimony, that the PBGC in 1985 would not have adhered to its policy of not terminating a plan when it could pay benefits due. Even though the plan would have been able to pay benefits due when it was terminated in 1992, the situation in 1992 was vastly different from the situation in 1985. In 1985, CF&I had sufficient credit built up from past funding contributions to relieve it of any obligation to make any minimum funding contributions. In 1992, however, CF&I was $39 million in arrears on its minimum funding contributions. In 1985, the plan had $45 million in assets to pay $5 to $6 million in benefits per year. In 1992, it had only $35 million in assets to pay $18

million in benefits per year. Moreover, given CF&I's 1990 bankruptcy filing and the company's resulting financial situation, the PBGC faced a huge unfunded liability and the potential increase in liability of $16 million per year if it did not immediately terminate CF&I's plan.

Because Rabushka cannot show that the PBGC would have terminated CF&I's plan in 1985, he has not shown the existence of false claim within the meaning of the FCA.

### III.

Rabushka argues that in granting judgment on the pleadings to Crane on count III, the district court erroneously concluded that the reverse false claims provision of 31 U.S.C. § 3729(a)(7) is not retroactive. Section 3729(a)(7) was first enacted in 1986 in legislation containing substantial amendments to the FCA. See False Claims Amendments Act of 1986, Pub.L. No. 99-562, § 2(7), 100 Stat. 3153 (1986). We have held that the 1986 amendments to the FCA do not apply retroactively. See Miller v. Federal Emergency Management Agency, 57 F.3d 687, 689 (8th Cir. 1995); see also Hughes Aircraft Co. v. United States ex rel. Schumer, No. 95-1340, 1997 WL 321246, at *4 (U.S. June 16, 1997) (noting presumption against retroactive legislation (citing Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994)). Given our conclusion in Miller, we cannot apply section 3729(a)(7) to Crane's pre-1986 conduct.[8]

_____

[8]Rabushka argues that reverse false claims were actionable under the pre-1986 version of the FCA. As the district court noted, however, every circuit considering the issue has rejected Rabushka's position. See American Heart Research Found., 996 F.2d at 10; United States v. Howell, 318 F.2d 162, 164-66 (9th Cir. 1963); United States ex rel. Kessler v. Mercur Corp., 83 F.2d 178, 181 (2d Cir. 1936); see also United States v. Bornstein, 423 U.S. 303, 309 n.4 (1976) (definition of false claim under FCA that did not include reverse false claims). We find these decisions persuasive, and we adopt their holdings.

**IV.**

The district court denied Rabushka's first and second motions to compel discovery. We cannot say that the district court grossly abused its discretion in denying Rabushka's first motion to compel. See Kinkead v. Southwestern Bell Tel. Co., 49 F.3d 454, 457 (8th Cir. 1995) (standard of review). Nor did the district court abuse its discretion in denying Rabushka's second motion to compel, which challenged Crane's assertion of the attorney-client and work product privileges. Crane met its burden of providing a factual basis for asserting the privileges when it produced a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit of its general counsel. See Zar v. South Dakota Bd. of Examiners of Psychologists, 976 F.2d 459, 463-64 (8th Cir. 1992) (standard of review). Rabushka argues that some of the documents are not protected because they were prepared by Crane's general counsel when he was acting in his capacity as corporate secretary, not as an attorney. Other than offering speculation based on a sampling of the descriptions of documents listed in the privilege log, Rabushka has offered no evidence to contradict Crane's evidence that the questioned documents were prepared by Crane's counsel while acting in a legal capacity. See Motley v. Marathon Oil Co., 71 F.3d 1547, 1551 (10th Cir. 1995) (district court did not abuse its discretion in determining that communications were for purpose of providing legal advice, based on privilege log, attorney's affidavit, and deposition testimony, and where plaintiff did not submit any evidence to contradict attorney's assertion that he provided legal, rather than business, advice), cert. denied, 116 S. Ct. 1678 (1996).

We also conclude that the district court did not abuse its discretion in denying Rabushka's claim that the crime-fraud exception applied to the documents requested in his second motion to compel, and in declining to perform an *in camera* review of those privileged documents. Rabushka did not meet his burden of making the necessary threshold showing that any specific document providing legal advice was

-15-

made in furtherance of Crane's alleged fraud and closely related to it.  See Pritchard-Keang Nam Corp. v. Jaworski, 751 F.2d 277, 283 (8th Cir. 1984) (standard for prima facie case).  Rabushka merely offered his general theory that a fraud occurred and asserted that any communications made aided that fraud, a showing that does not satisfy the requirements of the crime-fraud exception or justify *in camera* review.  See United States v. Zolin, 491 U.S. 554, 572 (1989) (must be showing of adequate factual basis to support good-faith belief by reasonable person that *in camera* review may reveal evidence to establish claim that crime-fraud exception applies); Pritchard-Keang Nam Corp., 751 F.2d at 282-83 & n.5 (rejecting argument that report should be discoverable because even if it was not communicated in furtherance of fraud, it was used by client to commit fraud).

Finally, in denying Rabushka's Rule 59(e) motion, the district court also denied Rabushka's separate motion for recusal.  See 28 U.S.C. §§ 455(a) & (b)(1).  We conclude that the district court did not abuse its discretion in doing so.  See In re Kansas Public Employees Retirement Sys. (KPERS), 85 F.3d 1353, 1358 (8th Cir. 1996) (standard of review).  Moreover, because it was not filed until after the district court had granted summary judgment to Crane on the merits of the case, the motion was untimely.  See In re KPERS, 85 F.3d at 1360 (recusal motion untimely and interposed for suspect tactical reasons, "can and should" be denied on that basis alone); see also Neal v. Wilson, 112 F.3d 351, 357 n.6 (8th Cir. 1997) (disapproving of tactic of waiting until after district court issued unfavorable ruling before moving for recusal).

The judgment is affirmed.

A true copy.

Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.