228 F.Supp.2d 1018 (2002)
UNITED STATES of America, ex rel. Cynthia A. SCHUHARDT and Nancy M. Becker, Plaintiffs,
v.
WASHINGTON UNIVERSITY, Defendant.
No. 99CV1202.
United States District Court, E.D. Missouri, Eastern Division.
August 20, 2002.
*1019 *1020 *1021 Susan J. Wirthlin, Laurence D. Mass, Clayton, MO, for Plaintiffs.
Robert T. Haar, Monica J. Allen, Haar and Woods, LLP, Claire M. Schenk, Deborah L. Golemon, Office of U.S. Attorney, St. Louis, MO, for Defendant.

MEMORANDUM AND ORDER
JACKSON, District Judge.
This matter is before the Court on defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b). Plaintiffs oppose defendant's motion, and the issues have been fully briefed.
Plaintiffs bring this qui tam action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq., alleging that defendant Washington University has submitted false claims under the Medicare Program, the Missouri Medicaid Program, the Civilian Health and Medical Program of the United States ("CHAMPUS") and the Illinois Public Aid Program.

*1022 I. Background

Plaintiffs Cynthia Schuhardt and Nancy Becker were employed by Washington University as "coders" in the Department of Surgery. As coders, plaintiffs determined the rate at which patients were billed for medical services by reviewing the information contained in patients' medical records. Plaintiffs allege that defendant improperly billed Medicare, Missouri Medicaid, CHAMPUS and Illinois Public Aid for attending physicians' services that were actually performed by residents or other non-physicians.
Plaintiff Schuhardt alleges that she complained to her supervisor about defendant's fraudulent billing practices several times, but that her complaints did not affect defendant's billing practices in any way. In fact, plaintiff alleges that she was ridiculed, harassed, demoted and eventually discharged because of her complaints.
Plaintiffs submitted their allegations to the United States government, pursuant to the qui tam provisions of the FCA, but the government declined to intervene in this action, citing its inability to make any specific allegations of fraud at this time. As such, plaintiffs have maintained this action, as relators, in the name of the United States.
Defendant brings this motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), arguing that plaintiffs' amended complaint should be dismissed in its entirety because plaintiffs have failed to state a claim under the FCA and because plaintiffs have not stated their fraud claims with sufficient particularity.

II. Legal Standards

The purpose of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the legal sufficiency of the complaint. A complaint is not to be dismissed for failure to state a claim for which relief can be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim entitling him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The factual allegations of a complaint are assumed true and construed in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The issue is not whether plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Id. Thus,
[i]f as a matter of law "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," ... a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one.
Neitzke v. Williams, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).
Rule 9(b) the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Under Rule 9(b), the term "circumstances" includes "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549 (8th Cir.1997) quoting Commercial Property Invs., Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir.1995). "Particularity" means "the who, what, when, where and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627-628 (7th Cir.1990).

*1023 III. Discussion

To state a claim under the FCA a plaintiff is required to establish: (1) that the defendant submitted a claim for payment to the federal government; (2) the claim was false or fraudulent; and (3) the defendant submitted the claim "knowing" that it was false or fraudulent. 31 U.S.C. § 3729; Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 563 (8th Cir. 1997). Defendant asserts that plaintiffs have failed to state a claim under the FCA because "the billing requirements that the University allegedly failed to follow simply do not exist in either law or the customary practices of the healthcare industry." Thus, defendant contends that the claims it submitted to the federal government were neither false nor fraudulent.
Central to plaintiffs' complaint is the theory that defendant billed federally funded programs for surgical procedures and other medical services performed by residents, fellows and/or nurses and falsely stated that they were performed by attending physicians. According to plaintiffs, the attending physicians were not physically present for any critical portion of the surgical procedures or medical services that were billed by the defendant and they did not supervise the residents, fellows and/or nurses who actually provided the services. Plaintiffs assert that this type of fraudulent billing occurred in several different situations, including: (1) surgical procedures; (2) pre- and postoperative care; (3) consultations with other doctors regarding whether or not surgery was indicated; (4) bedside procedures; (5) emergency room procedures; (6) night and weekend services; and (7) wound healing clinic services. Defendant has moved to dismiss plaintiffs' complaint on several different grounds. The Court will address each argument individually.

1. The Presence Requirement for Teaching Physicians Under the Medicare Act and Its Interaction with Global Surgical Billing

Defendant asserts that plaintiffs misconstrue the Medicare requirements for reimbursement of a surgical procedure in a teaching setting, and specifically argue that attending physicians do not have to be physically present during pre-operative and post-operative resident visits because such services are billed globally under the surgical procedure, itself. Thus, according to defendant, the central issue before the Court is whether Medicare regulations require that an attending physician be present during any pre- or post-operative care when billing globally for a package of surgically related services. Assuming without deciding that defendant has correctly construed plaintiffs' allegations as concerning only surgical procedures and pre- and post-operative care in various hospital settings, the Court will examine the teaching physician payment rules under the Medicare program, in relation to pre- and postoperative care, as a means of deciding whether an attending physician must be present in order to bill globally for surgically related services.

A. Review of the Medicare Act
Title XVIII of the Social Security Act of 1935 establishes a federally subsidized health insurance program for elderly and disabled persons. 42 U.S.C. § 1395 (the "Medicare Act"). Part A of the Medicare Act covers institutional health costs, such as hospital expenses (e.g., room, board, nursing, residents' salaries, and other inpatient care costs). 42 U.S.C. §§ 1395c-1395i-2. Part B covers medical services provided directly to individuals on a fee-for-service basis such as physician services, medical supplies, and diagnostic/laboratory tests. 42 U.S.C. §§ 1395j-1395w. Coverage and payment for services rendered *1024 to beneficiaries is administered by the Secretary of the Department of Health and Human Services ("HHS") through the Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"). CMS is responsible for developing the details of the Medicare program, through regulations and interpretive guidelines, and for overseeing the actions of the regional intermediaries. See 42 U.S.C. § 1395u. For Medicare Part B claims, the type of claims that are at issue in this case, CMS contracts with private insurance companies nationwide, known as "carriers," to process claims and to perform payment safeguard functions. Id. Thus, physicians participating under Medicare Part B submit bills to Medicare carriers, which process claims on behalf of HHS. To communicate its guidelines to the intermediaries responsible for administering the program on a day-to-day basis, CMS publishes various manuals, including the Medicare Carrier Manual ("MCM"). The bills submitted for reimbursement under Medicare Part B are subject to auditing both by the carriers, under 42 U.S.C. § 1395u(a)(1)(C), and the Inspector General of HHS, under 5 U.S.C.App. 3 §§ 4(a)(1), 2(1).
Physicians who participate in the Medicare program are subject to a variety of sanctions if they receive payments based on false statements. First, they may be prosecuted for criminal violations. Second, the Attorney General may bring a civil action for damages and penalties pursuant to the FCA. Third, the Attorney General may refer the matter to the Secretary of HHS for possible administrative penalties and sanctions. See 42 U.S.C. §§ 1320a-7a(a), 1320a-7b(f)(1); 31 U.S.C. §§ 3801-3812. Finally, the Secretary may seek to reopen physicians' claims for payment and seek to recover past overpayment in an administrative recoupment proceeding. 42 U.S.C. § 1395gg(b); 42 C.F.R. § 405.841.

B. Reimbursement of Teaching Hospitals under the Medicare Act
Teaching hospitals and their residency programs are a vital part of the graduate medical education ("GME") in the United States. Thus, CMS recognizes that many Medicare beneficiaries receive medical care at teaching hospitals, and it anticipates that residents will participate in the care of beneficiaries at teaching hospitals. See MCM § 15016.B. As such, supervision of interns and residents is reimbursed under Medicare Part A through GME payments. See 42 U.S.C. § 1886(h). Section 1886(h) addresses Medicare payments to hospitals and hospital-based providers for the costs of approved GME programs in medicine, osteopathy, dentistry, and podiatry. Those costs include residents' salaries and fringe benefits, physician compensation costs for GME program activities and other GME program costs. See 42 C.F.R. § 413.85. These payments are intended in part to cover the portion of the teaching physicians' salaries that is related to the time they spend teaching residents. By this mechanism, teaching physicians are paid for taking responsibility for the hospital's oversight of its doctors in training. In addition, under 42 U.S.C. § 1886(d)(5)(B), Medicare makes additional payments to teaching hospitals under the prospective payment system for the higher indirect operating costs hospitals incur by having GME programs. Medicare also supports GME programs in teaching hospitals through billings for the services of attending physicians who involve residents in the care of their patients.[1] However, this support is furnished *1025 in the form of reimbursement for physicians' services under Medicare Part B.

C. Reimbursement of Teaching Physicians Under the Medicare Act From 1967 to June of 1996
At issue in this case are the regulatory requirements with respect to services and documentation by teaching physicians for obtaining payment for Part B services administered, with the assistance of residents and/or interns, at teaching hospitals. Plaintiffs claim that a teaching physician must be physically present in order to bill Medicare Part B for the teaching physician's services. Defendant asserts that there is no such physical presence requirement. Based on a review of the pertinent regulations and agency interpretations of such regulations, the Court concludes that until June of 1996, Medicare required a teaching physician to be physically present, for both surgical services and pre- and post-operative care, in order to receive reimbursement under Part B.
As originally enacted, the Medicare Act excluded the services of physicians, interns and residents from the definition of "inpatient hospital services," except for the services of interns and residents in approved training programs. The Act did not include specific rules on payment for physician services in teaching hospitals, although it did provide rules establishing principles of reimbursement for services by hospital-based physicians. One such principle was that these services were available to be reimbursed under Medicare Part B if the physician provided "an identifiable service requiring performance by a physician in person." 20 C.F.R. § 405.483(a) (1966)[2]. This regulation was in effect until 1982.
In August of 1967, CMS (known at that time as the Bureau of Health Insurance), issued regulations governing payments for physician services in teaching hospitals. See 42 C.F.R. § 405.520 and 405.521 (1967). Under the provisions of these regulations, a physician in a teaching setting was considered the attending physician for a Medicare patient, and thereby qualified for Medicare Part B reimbursement only if he or she furnished "personal and identifiable direction" to the interns and residents who provided the actual service to the patient, or, in the case of "major surgical procedures and other complex and dangerous procedures or situations," the attending physician provided direction "in person." 42 C.F.R. § 405.521(b) (1968). These regulations were in effect, in substantial part, until June 1996.[3] Although the regulations specifically state that reimbursement for a major surgical procedure would be provided only if the attending physician has provided direction "in person," the regulations were somewhat vague as to the presence requirement for pre- or post-operative care, stating only that "personal and identifiable direction" was needed to apply for reimbursement.
Shortly after §§ 405.520 and 405.521 were issued, it became apparent that some *1026 Medicare carriers were paying charges for physician services in some teaching hospitals even though interns and residents were primarily providing the care for the patients within those hospitals. See 54 Fed.Reg. 5946, 5948 (1989). "The physicians who were billing for these services were often assuming only limited responsibility for the medical management of the patients['] treatment[s]." Id. Thus, in April of 1969, CMS issued specific guidance establishing conditions for Part B payments to supervising physicians in a teaching setting. See Bureau of Health Insurance, Intermediary Letter No. 372 ("IL-372") (1969). Before reviewing the substance of IL-372, the Court will note the standard of deference accorded to an agency interpretation.
A court is required to "give substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) citing Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 150-151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). An agency's interpretation must be given "`controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Thomas Jefferson Univ., 512 U.S. at 512, 114 S.Ct. 2381 quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). In other words, a court must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." Gardebring v. Jenkins, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988). This extensive deference is particularly warranted when "the regulation concerns `a complex and highly technical regulatory program,' in which the identification and classification of relevant `criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Thomas Jefferson Univ., 512 U.S. at 512, 114 S.Ct. 2381 quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991). The teaching physician reimbursement regulations concern a regulatory program, under Medicare, that is without a doubt "complex and highly technical." Thomas Jefferson Univ., 512 U.S. at 512, 114 S.Ct. 2381. Further, it "entail[s] the exercise of judgment grounded in policy concerns." Id. Thus, the Court will give deference to the interpretative guidelines published by CMS through the auspices of HHS.
Under IL-372, to be reimbursed under Part B, a teaching physician must have been the patient's "attending physician." To be recognized as such, the physician must have "rendered sufficient personal and identifiable medical services to the Medicare beneficiary to exercise full, personal control over the management of the portion of the case for which a charge [could] be recognized." Id. Intermediary Letter 372 went on to state that in order to exercise such control, the teaching physician must have, among other things, "either actually perform[ed] the services required by the patient or supervise[d] the treatment provided by others so as to ensure that appropriate services and quality care [we]re provided ... and [must have been] present and ready to perform any service performed by an attending physician in a nonteaching setting when a major surgical procedure or a complex or dangerous medical procedure [was] performed." Id. Documentation of such "personal and identifiable services" must have been demonstrated by "notes and orders in the patient's records that [were] either written by or countersigned by the supervising physician." Id. Further guidance was provided in the form of illustrations such as the following:

*1027 A physician carried out all of the activities listed above for a surgical patient until midway in the postoperative period, when the physician's teaching tour of duty ended. Since he was not responsible for the continuing care of the patient throughout the postoperative period, he cannot be reimbursed as the attending physician for that period.
IL-372 further stated:
If the physician acted as the attending surgeon but did not render the pre- or post-surgical services generally performed by a private surgeon to a private patient, the difference in service should be reflected in the amount of reimbursement.
CMS further explained, in Intermediary Letter 70-2, that a physician's status as "attending" was important where medical or surgical services were performed in his presence. Bureau of Health Insurance, Intermediary Letter No. 70-2 ("IL-70-2") (1970). IL-70-2 also stated, in a question and answer on IL-372, that the supervising physician must have either personally performed the service or functioned as the attending physician and been present while a service was being furnished, in order to claim reimbursement under Medicare Part B. See IL-70-2, question 14. Thus, from the guidance provided in IL-372 and IL-70-2, it is obvious that CMS interpreted §§ 405.520 and 405.521 to require a physician to be personally present at the time of surgical services and pre-and post-operative services in order to bill for Part B compensation. This message became even clearer in later legislative history surrounding reimbursement for teaching physicians.
In 1980, Congress enacted a statute governing carrier documentation requirements for Part B payments for teaching physician services. In language similar to IL-372, it states that a carrier shall not pay for physicians' services provided to patients under an approved teaching program unless the physician "renders sufficient personal and identifiable physicians' services to the patient to exercise full, personal control over the management of the portion of the case for which the payment is sought." 42 U.S.C. § 1395u(b)(7)(A)(i) (1980). The conference committee for this law explicitly endorsed the IL-372 guidance for documenting payment by teaching physicians. See H.R. No. 96-1479, 145-146 (1980). In addition, the House Budget Committee (whose provision establishing criteria for payment of teaching physicians was adopted in conference) stated that it "strongly believe[d] teaching physicians should personally perform or personally supervise patient services in order to qualify for fee-for-service payment." See H.R. No. 96-1167, 69-70 (1980). Two years later, Congress enacted a law directing the Medicare agency to promulgate regulations to distinguish between professional medical services that are reimbursable under Part B and those that are not. The Senate Finance Committee (whose provision calling for regulations was subsequently adopted in conference) stated:
Under current law and regulations, services furnished by a physician to hospital inpatients are reimbursed on the basis of reasonable charges under [P]art B only if such services are identifiable professional services to patients that require performance by physicians in person and which contribute to the diagnosis and treatment of individual patients.
Thus, the legislative history underscores the belief that Part B payment should occur only as a result of physicians rendering professional services in person. There is further bolstering for this theory in a letter, written in December of 1992, that the Director of CMS's Office of Payment Policy distributed to CMS regional offices clarifying that teaching physicians must be *1028 physically present during all procedures in order to receive Part B reimbursement. See Medicare: Concerns With Physicians at Teaching Hospitals (PATH) Audits, GAO/HEHS-98-174, July 23, 1998. That letter stated:
The policy, as set forth in Intermediary Letter No. 372, Part B Intermediary Letter 70-2, and MCM section 15016, is that physicians' fees are payable in teaching hospitals if:
(1) the physician personally performs an identifiable service; or
(2) the chart indicates that the physician has performed those activities necessary to qualify as an "attending physician" and the physician is physically present when the resident performs the identifiable service for which payment is sought.
The regional offices were directed "to convey this information to the carriers in [their] region."
Although the aforementioned make it quite clear that physical presence was required for a teaching physician to obtain reimbursement for a resident's services under Medicare Part B, it appears that CMS confused these guidelines in 1995. In a letter written by the Director of CMS's Bureau of Policy Development to an attorney representing Medicare providers, the Director stated that carriers that had not applied a physician presence requirement prior to the December 1992 memo should not substitute such policy until CMS could issue a final rule on the subject. Id. Further, on December 8, 1995, in the preamble to the new rules pertaining to Medicare reimbursement in a teaching setting, CMS noted that while IL-372 and related issuances specifically stated "that the attending physician had to be present when a major surgical procedure or a complex or dangerous medical procedure was performed," the guidance was "vague, perhaps, necessarily, on the matter of presence of the physician during other occasions of inpatient service." 60 Fed.Reg. 63124 (1995).
Nevertheless, the Court concludes that from 1967 to June of 1996 Medicare required a teaching physician to either personally perform an identifiable service or be physically present when the resident performed the identifiable service for which payment was sought, including surgical services and pre- and post-operative services, in order to obtain reimbursement under Medicare Part B. The Court's view is consistent with CMS's opinion offered in a letter written in 1997 from Harriet Rabb, HHS General Counsel:
"As you know, supervision of interns and residents by teaching physicians is reimbursed under Medicare Part A through graduate medical education (GME) payments. By this mechanism, teaching physicians are paid for taking responsibility for the hospital's oversight of its doctors in training. It would be absurd to assert that physicians could receive the significant remuneration that characterizes Part B reimbursement for supplying the same level of services that qualifies and was paid for as Part A services. The physical presence of a physician with the treating intern or resident at the time of treatment is one clear indication of a more patient-specific level of responsibility for the physician entitling her or him to Part B, rather than Part A, reimbursement. That view is consistent with both common sense and the history of this subject as recounted [above]." See Letter from Harriet Rabb, HHS General Counsel to Jordan J. Cohen, M.D., President of the Assn. of American Medical Colleges, and P. John Seward, M.D., Executive Vice President of the American Medical Association (July 11, 1997) (the "Rabb Letter").

*1029 D. Reimbursement of Teaching Physicians Under the Medicare Act From July 1, 1996 to Present
On December 8, 1995, the Secretary of HHS published final regulations revising the requirements for Part B Medicare claims by teaching physicians. See 60 Fed.Reg. 63124 (1995). These regulations became effective on July 1, 1996. The statute of limitations for FCA cases, when the government does not intervene, is six years. See 31 U.S.C. § 3731. Because this case was filed on July 29, 1999, the plaintiffs can allege false claims dating back to and including July 29, 1993. It thus becomes necessary for the Court to interpret the teaching physician presence requirements that existed before and after July 1996.[4]
According to the July 1996 regulations, payment for services performed in teaching settings are payable under the physician fee schedule if:
(a) the services are personally furnished by a physician who is not a resident; or
(b) the services are furnished by a resident in the presence of a teaching physician except as provided in § 415.172, § 415.174, § 415.176 and § 415.184. 42 C.F.R. § 415.170.
Furthermore, 42 C.F.R. § 415.172 states:
(a) General rule. If a resident participates in a service furnished in a teaching setting, physician fee schedule payment is made only if a teaching physician is present during the key portion of any service or procedure for which payment is sought.
(1) In the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure.
(i) In the case of surgery, the teaching physician's presence is not required during opening and closing of the surgical field.
(ii) In the case of procedures performed through an endoscope, the teaching physician must be present during the entire viewing.
(2) In the case of evaluation and management services, the teaching physician must be present during the portion of the service that determines the level of service billed. (However, in the case of evaluation and management services furnished in hospital outpatient departments and certain other ambulatory settings, the requirements of § 415.174 apply.)
Defendant argues that these regulations do not dictate the type or quantity of care the teaching physician must personally provide in connection with pre- and/or post-operative care. Defendant is somewhat correct in its assertions. Section 415.170 provides the general rule that services must be either personally furnished by the physician who is not a resident or the services must be furnished by a resident in the presence of a teaching physician. However, exceptions to these requirements can be found in § 415.172, § 415.174, § 415.176 and § 415.184. In 42 C.F.R. § 415.172, another general rule is given; namely, that a physician fee schedule payment is made only if a teaching physician is present during the key portion of any service or procedure for which payment is sought. (emphasis added). The regulation speaks directly to the presence requirement in the case of surgical, highrisk *1030 or other complex procedures, when it states that the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. (emphasis added). However, the regulation does not seem to speak directly to pre- and/or postoperative services. Thus, the presence requirement as applied to these services must be extrapolated from the interpretive guidelines. The Medicare Carrier Manual § 15016, effective May 1997, states:

3. Procedures.  ....
a. Surgery (Including Endoscopic Operations).The teaching surgeon is responsible for the preoperative, operative, and postoperative care of the beneficiary. The teaching physician's presence is not required during the opening and closing of the surgical field unless these activities are considered to be key or critical portions of the procedure. The teaching surgeon may determine which postoperative visits are considered key and require his or her presence. However, if the postoperative period extends beyond the beneficiary's discharge and the teaching surgeon is not going to be involved in the beneficiary's follow-up care, the instructions on billing for less than the global package in § 4824.B apply......
Although the MCM states that the teaching surgeon is responsible for all pre- and post-operative care, it also states that the teaching physician may determine which post-operative visits are considered key and require his or her presence. The MCM does not speak to the presence requirement for pre-operative care. Thus, the Court can only look to the regulations themselves for assistance in interpreting such a requirement. Because § 415.172 states that a physician fee schedule payment will be made only if a teaching physician is present during the key portion of any service or procedure for which payment is sought, this Court concludes that, like the MCM determination as to post-operative visits, a teaching physician may determine which pre-operative visits are considered key and require his or her presence.

E. Effect of Global Billing on Reimbursement for Pre- and Postoperative Care by a Resident
Having decided whether a teaching physician's physical presence was required at the time a resident performed pre- and/or post-operative services in order for a teaching physician to seek reimbursement under Medicare Part B, the Court will now address the effect that Medicare's global billing policies have had on these requirements.
The global billing policy was adopted on January 1, 1992 as part of Medicare's conversion from a fee payment system based on reasonable charge principles to a system based on relative value units ("RVUs"). 56 Fed.Reg. 59502, 59504 (1991). An example of this practice involves Medicare reimbursement for surgical procedures performed by physicians. Under the global billing system, the Medicare program reimburses physicians for surgical procedures under codes which are intended to reimburse not only for the surgery itself but also for certain pre-operative, intra-operative, and post-operative services that are related to the surgery. See 42 C.F.R. § 414.40(b)(1); MCM § 4821.A. The global period for minor surgeries begins on the day of the procedure and continues, at most, for 10 days. MCM § 4821.C. The global period for major surgeries begins on the day before surgery and continues for the next 90 days. MCM § 4821.E.
*1031 Medicare guidelines address global billing situations in which multiple physicians participate in the care of one patient. See MCM § 4821.D. (physicians furnishing less than the full global package); MCM § 4822.A.1 and 3 (physicians who furnish part of a global surgical package); MCM § 4824.A. (fragmented billing of services included in the global package); MCM § 4824.B. (claims from physicians who furnish less than the global package split care). However, the MCM does not address the specific allegations involved in this case ___ global surgical billing for services done by residents not in the presence of attending physicians. Thus, a question arises as to whether HHS ever contemplated that global billing would change the teaching physician presence requirements enumerated above. This question can be framed another way, i.e., is it improper to bill Medicare for the entire global surgical procedure fee if a resident performed some of the global services without the presence of a teaching physician?
CMS briefly addressed this issue in its comments on the proposed regulations surrounding global billing. See 56 Fed.Reg. 59502 (November 25, 1991). "The proposed rule ... stated that attending physician criteria for teaching physicians would remain in effect under the physician fee schedule." Id. at 59521. A look at the proposed rule provides even more guidance to this situation.
We are retaining the requirements in the regulations and operating instructions for determining when a teaching physician is considered an attending physician and can bill for services performed by an intern or resident under his or her direction. (For a more detailed explanation of the attending physician criteria, see § 405.521(b) and Intermediary Letter 372.) These attending physician criteria for teaching physicians would remain in effect under the fee schedule. (That is, the fee schedule would change the amount that Medicare pays, but not the services for which it pays.) On February 7, 1989, we published a proposed rule (54 FR 5946) setting forth changes in the requirements for determining when a teaching physician can bill for services involving the supervision of interns and residents and changes in the policies for determining the customary charge of a teaching physician. The payments aspects for this rule would largely be irrelevant since customary charges would no longer be applicable under the fee schedule. We have therefore modified §§ 405.521, 405.522 and 405.580 to reflect the change to the fee schedule. Those portions of the regulations for determining when a teaching physician's services are covered (that is, when the attending physician requirement is met) would be retained. With respect to the proposed changes in the attending physician criteria that were the subject of the aforementioned proposed rule, we plan to finalize this rule in the future. 56 Fed.Reg. 25792, 25798 (June 5, 1991).
Thus, CMS made it clear that the new global fees would change "the amount Medicare pays but not the services for which it pays."
It is this Court's interpretation of the regulations in effect from 1967 to June of 1996 that a teaching physician must have either personally performed an identifiable service or have been physically present when the resident performed the identifiable service for which payment was sought, including both surgical services and pre- and post-operative services, in order to obtain reimbursement under Medicare Part B. Furthermore, it is this Court's interpretation of the regulations in *1032 effect from July 1, 1996 to present, that if the teaching physician decided that neither pre- nor post-operative services were "key" portions of the billable service, then those services could be performed by a resident without the need for a teaching physician's physical presence during the service and still be eligible for reimbursement under Medicare Part B. Conversely, if the teaching physician decided that a pre-operative and/or post-operative service was a key portion, then the teaching physician must have performed such service herself or must have been physically present during the time a resident was performing the service in order to ask for reimbursement under Medicare Part B. If the teaching physician neither physically supervised the resident in the performance of the key portion nor performed the key portion herself, then a reduced global fee must have been billed to Medicare Part B. It is also this Court's finding that the teaching physician presence regulations, as interpreted above, are not rendered moot or modified in any way by Medicare's global billing policy for surgical procedures. As such, in accordance with the Court's interpretation of the Medicare regulations surrounding attending physician presence requirements, plaintiffs have not failed to state a claim under the FCA.

2. Billing From Operative Notes

Defendant argues that plaintiffs have failed to state a claim for improper billing from operative notes. Plaintiffs clarify that the allegation that defendant wrongfully billed from operative notes should be taken in the context of the general allegations that "[d]efendant billed for services rendered only by [r]esidents in which the [a]ttending [p]hysicians did not participate." Plaintiffs further state that "this is not an allegation that [d]efendant simply billed before the end of the global billing period." Because the statements concerning "billing from operative notes" are included in the complaint to provide further bolstering for the general improper billing allegations and are not made to support a separate cause of action, the defendant's request that they be dismissed from the complaint will be denied.

3. Plaintiff's Allegations Regarding Consultations, Bedside Procedures, Night and Weekend Services, Emergency Room Consultations and Wound Healing

Defendant claims that plaintiffs have failed to state a claim for improper billing for consultations, bedside procedures, night and weekend services, emergency room consultations and wound healing procedures for various reasons. The Court will address each of defendant's arguments individually.
Defendant first argues that plaintiffs failed to state a claim for improper billing of consultations and night and weekend services because plaintiffs do not allege that a teaching physician was not present during such procedures and/or plaintiffs do not allege that the teaching physician did not perform his or her own consultation. Plaintiffs reply that in their general allegations (see paragraphs 39-42 of the amended complaint) they explain how coders obtained attending physician's signatures on parts of the medical records long after the fact so that they could "document" the attending physician's "participation" in providing consultation services before billing them. Thus, plaintiffs argue that in that context, a reasonable inference can be drawn from plaintiffs' specific allegations (see paragraphs 79, 87 and 89 of the amended complaint) that attending physicians were not present when a resident performed the service. For example, in paragraph 79 of the amended complaint plaintiffs allege, "Defendant knowingly billed Medicare as though [a]ttending *1033 [p]hysician Cooper performed the consultation; however a[r]esident performed the consultation." It is apparent to the Court, in light of plaintiffs' general allegations that residents were performing services without the presence of a teaching physician, that plaintiffs are claiming that a resident performed the consultation without the presence of attending physician Dr. Cooper, yet billed as though Dr. Cooper had performed the services. Such allegations properly state a claim for relief. Further, a review of plaintiffs' other allegations regarding consultations and night and weekend services lead the Court to conclude that plaintiffs have properly stated a claim for relief.
Defendant next argues that plaintiffs fail to state a claim for improper billing of bedside procedures because plaintiffs fail to allege that such procedures were not related to global surgical procedures and/or plaintiffs fail to allege that such procedures were billed separately from the global surgical billing yet should have been included within the global billing, a process known as fragmented billing. See U.S. v. Brown, 988 F.2d 658 (6th Cir.1993). Plaintiffs admit that they were not totally consistent in their general allegations on bedside procedures in that they state that these procedures were billed "separately, and in addition to" global billing for surgical procedures (see paragraph 43 of the amended complaint), and they also refer to billing for these procedures when provided by residents as "up-coding" (see paragraph 44 of the amended complaint). The two specific examples of bedside procedures are contained in paragraphs 75 and 82 of the amended complaint. In those examples, plaintiffs allege that residents performed post-operative services alone, without the presence of a teaching physician, and that defendant billed Medicare for the entire global fee. The plaintiffs further state that these examples relate to the separate billing referred to in paragraph 43. The Court finds the allegations pertaining to bedside procedures sufficient to state a claim.
Defendant next argues that the claims for improper billing for emergency room consultations should be dismissed because plaintiffs have not cited any specific instances in which this allegedly occurred. The plaintiffs are not required to have a specific allegation to substantiate each and every general allegation in their complaint. However, the Court believes it is appropriate to address this issue further in the context of defendant's argument that plaintiffs have failed to plead fraud with particularity.
Defendant also argues that plaintiffs have failed to state a claim for improper billing in regards to services provided at the wound healing clinic because plaintiffs failed to allege that any false claims were actually submitted to the federal government. Paragraph 53 of the amended complaint states, "In the Wound Healing Clinic, all wound cleaning was done by a[n]urse named Laurel, but billed under the name of an [a]ttending [p]hysician, Dr. Kraemer." The Court finds this sufficient to state a claim. Further, if, as defendant asserts, the Wound Clinic patient identified in paragraph 54 of the amended complaint was privately-insured, the defendant may present evidence of that in support of a motion for summary judgment.
Lastly, defendant argues that the use of Exhibits 1-4 does not bolster the plaintiffs' claims because plaintiffs admit that the charges listed on Exhibits 2-4 were not submitted to Medicare. However, the amended complaint states that after the attending physicians signed portions of the charts flagged by coders for charges on those lists, long after the services were rendered, the coders "would bill Medicare for the services, whether or not the [a]ttending *1034 [p]hysician had provided or supervised the services." See paragraph 72 of the amended complaint. Implicit in this allegation is that residents were performing services, without the presence of a teaching physician, yet billing Medicare for the services as though they were performed, or attended by, the teaching physician.
It appears that defendant is arguing that Exhibits 2-4 are, in actuality, lists that were to be "edited" before being billed to Medicare. In doing so, it seems that defendant is asserting that such "editing," i.e., "review of documentation before a claim is submitted to ensure that the claim is valid," was a perfectly legal practice in which attending physicians signed off on a chart in order to comply with Medicare regulations for billing. Plaintiffs have condemned this practice as an after-the-fact "cover-up" or "sanitation" of files by defendant in anticipation of a federal audit. Defendant states that this after-the-fact documentation was not illegal, and further, that Medicare was not billed (in the case of the charges in Exhibits 2-4) until the documentation was complete. It remains to be seen whether the plaintiffs' interpretation of the documents or that of the defendant's will be substantiated by other evidence. However, at the present time, the Court cannot conclude that the exhibits do not support the plaintiffs' claims.

4. Pleading Fraud with Particularity

Defendant argues that plaintiffs' amended complaint fails to plead fraud with particularity, as required by Federal Rule of Civil Procedure 9(b). Previously, the Court denied without prejudice the defendant's motion to dismiss the original complaint for failure to plead fraud with particularity. Instead, on December 10, 2001, the Court ordered plaintiffs to amend their complaint to conform with the Rule 9(b) particularity requirements. However, the Court specifically stated:
Because of the breadth of the allegations  possibly hundreds of doctors and thousands of claims over several years  the complaint need not cite specifics for every transaction. But a relator "must provide some representative samples of the fraud which detail the specifics of who, where and when." United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Syst. Corp., 1997 U.S. Dist. LEXIS 21402 at *33 (D.Minn. March 3, 1997).
The Court feels that plaintiffs have provided enough representative samples, detailing the specifics of who, where and when to allow defendant to properly prepare their case. No longer is plaintiffs' complaint based on just "information and belief." Plaintiffs have named specific doctors, and have identified specific dates and services supporting their allegations of improper Medicare billings. Further, plaintiffs have identified specific amounts billed for specific patients as representative samples of the alleged fraudulent billing. The Court does not believe now, nor did it believe at the time of the earlier order, that plaintiffs should be required to provide a specific allegation to substantiate each and every general allegation within the complaint. However, the Court notes that with the attachment of Exhibit 1 to the amended complaint, plaintiffs have probably done just that.
The defendant argues that the Court should adopt the reasoning of the recent case, United States ex rel. Clausen v. Laboratory Corporation of America, Inc., 290 F.3d 1301 (11th Cir.2002), in which the court dismissed a false claims complaint for failure to allege specific facts. In Clausen, the amended complaint did not identify a single false claim actually submitted to the government. Such is not the *1035 case here. Accordingly, the Court finds that plaintiffs have fulfilled the pleading requirements of Federal Rule of Civil Procedure 9(b).

5. Plaintiff Schuhardt's Retaliation Claims

Defendant argues that plaintiff Schuhardt has failed to state a claim for retaliation under the FCA. The FCA prohibits employment discrimination "because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under [the FCA]." 31 U.S.C. § 3730(h). The elements of a retaliation claim under the FCA are (1) the plaintiff was engaged in protected conduct, i.e., acts done in furtherance of an action under § 3720; (2) the defendant was aware that the plaintiff was engaged in such conduct; and (3) the defendant discriminated against the plaintiff in retaliation for engaging in such conduct. Norbeck v. Basin Electric Power Cooperative, 215 F.3d 848, 850 n. 2 (8th Cir.2000).
Defendant first argues that plaintiff Schuhardt cannot recover for her retaliation claim because "the practices that plaintiff claims to have brought to the attention of her supervisor were entirely legitimate." It appears that defendant is arguing that plaintiff Schuhardt has no retaliation claim because there is no physician presence requirement within the Medicare regulations. Because the Court has already found that there is a physician presence requirement under the applicable Medicare regulations, defendant's argument must fail.
Defendant next argues that plaintiff Schuhardt's allegations are insufficient to bring her conduct within the ambit of the FCA's anti-retaliation provision. In the amended complaint, Schuhardt alleges that she complained to her supervisor that the policy of global billing from operative notes and billing for work done by residents when no attending physician was physically present was "wrong"; that she reported her "concerns" about the defendant's billing practices; and that she "engaged in protected activity under the False Claims Actspecifically, she questioned and complained about Defendant's billing practices not conforming to statutory and regulatory requirements" of Medicare and other federal programs. Schuhardt further alleges that she was retaliated against "because of lawful acts done by her in the furtherance of an action under the False Claims Act, including her report of the false claims to her supervisor." Defendant argues that Schuhardt's failure to allege that she specifically reported fraud or illegality, as opposed to mere wrongdoing, in the defendant's billing practices is fatal to her retaliation claim. Plaintiff Schuhardt has no claim because she never specifically mentioned "fraud" or "illegality" when she notified her supervisor of the improper billing.
An employee must have engaged in "protected conduct" in order to assert a claim under § 3730(h). Section 3730(h) specifies that "protected conduct" includes "investigation for, initiating of, testimony for, or assistance in" a FCA suit. At issue here is whether Schuhardt has sufficiently pleaded that she put her employer on notice of the distinct possibility of FCA litigation. The majority of the cases cited by defendant in support of its motion to dismiss the retaliation count are decisions rendered after a motion for summary judgment has been made. Because the matter presently before the Court is a motion to dismiss, the Court may only review the complaint to ascertain whether or not plaintiff Schuhardt has properly pleaded the elements of her retaliation claim.
Although the amended complaint contains no specific allegation that plaintiff *1036 Schuhardt was investigating fraud in contemplation of bringing a qui tam action, it does state that plaintiff Schuhardt was retaliated against "because of lawful acts done by her in the furtherance of an action under the False Claims Act, including her report of the false claims to her supervisors." (emphasis added). It is further alleged that Schuhardt "understood that she was committing fraud at the direction and compulsion of her employer ..." Based on these allegations, the Court cannot say that there is no set of facts which would entitle plaintiff Schuhardt to relief. As such, defendant's request for dismissal of plaintiff Schuhardt's retaliation claim must be denied.
Accordingly,
IT IS HEREBY ORDERED that defendant's motion to dismiss plaintiffs' complaint [#37] is denied.
NOTES
[1] A teaching physician is defined as a physician (other than another resident) who involves residents in the care of his or her patients. MCM § 15016. A resident is defined as an individual who participates in an approved graduate medical education program or a physician who is not in an approved GME program but who is authorized to practice only in a hospital setting. MCM § 15016; see also 42 C.F.R. § 415.152 (2001).
[2] 20 C.F.R. § 405.483 was moved from Title 20 to Title 42 in 1977. See 42 C.F.R. § 405.483 (1977).
[3] 42 C.F.R. § 405.521 was moved from Title 20 to Title 42 in 1977. See 42 C.F.R. § 405.521 (1977). Although § 405.521 did undergo some changes between 1967 and 1996, the wording regarding physician presence requirements remained substantially the same.
[4] If the government chooses to intervene at a later date, which it has reserved the option to do, then the claims may go back as far as July 29, 1989. See 31 U.S.C. § 3731.