361 F.Supp.2d 992 (2003)
UNITED STATES of America, ex rel. Cynthia A. SCHUHARDT and Nancy M. Becker, Plaintiffs,
v.
WASHINGTON UNIVERSITY, Defendant.
No. 4:99-CV-1202 CEJ.
United States District Court, E.D. Missouri, Eastern Division.
September 29, 2003.
*993 *994 *995 Laurence D. Mass, Susan J. Wirthlin, Clayton, MO, for Plaintiffs and Defendant.
Monica J. Allen, Robert T. Haar, Haar and Woods, LLP, St. Louis, MO, for Defendant and Claimant.
Claire M. Schenk, Deborah L. Golemon, Joseph B. Moore, Office of U.S. Attorney, St. Louis, MO, for Movant.

MEMORANDUM AND ORDER
JACKSON, District Judge.
This matter is before the Court on defendant's motion for summary judgment. See Fed.R.Civ.P. 56(c). Plaintiffs have responded to defendant's motion, and the issues have been fully briefed.
Plaintiffs bring this qui tam action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq., alleging that defendant Washington University submitted false claims under the Medicare Program, the Missouri Medicaid Program, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") and the Illinois Public Aid Program.
I. Background and Procedural History
Plaintiffs Cynthia Schuhardt and Nancy Becker were employed by Washington University as "coders" in the Department of Surgery. As coders, plaintiffs determined the rate at which patients were billed for medical services by reviewing the information contained in patients' medical records. Plaintiffs claim that defendant falsely and fraudulently billed Medicare, Missouri Medicaid, CHAMPUS and Illinois Public Aid for attending physicians' services that were actually performed by residents or non-physicians.
Plaintiff Schuhardt alleges that she complained to her supervisor about defendant's fraudulent billing practices several *996 times, but that her complaints did not affect defendant's billing practices in any way. She further alleges that she was ridiculed, harassed, demoted and eventually discharged because of her complaints.
Plaintiffs submitted their allegations to the United States government, pursuant to the qui tam provisions of the FCA, but the government declined to intervene in this action, citing its inability to make any specific allegations of fraud at that time. As such, plaintiffs have maintained this action, as relators, in the name of the United States.
On June 25, 2001, defendant filed a motion to dismiss this action, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), arguing that plaintiffs failed to plead fraud with particularity. On December 10, 2001, the Court agreed that plaintiffs' complaint failed to satisfy Rule 9(b) but granted plaintiffs leave to file an amended complaint in order to provide some representative samples of their allegations of fraud. On January 9, 2002, plaintiffs filed their amended complaint in which they made specific allegations of fraud with regard to fifteen patients. On April 19, 2002, defendant filed a motion to dismiss plaintiffs' complaint, arguing that plaintiffs had failed to state a claim and that, again, plaintiffs had failed to plead fraud with particularity. The Court denied defendant's motion on August 20, 2002 finding that plaintiffs had stated a claim under the FCA and that plaintiffs satisfied Rule 9(b) by naming specific doctors, specific dates and specific services supporting their allegations that defendant improperly billed Medicare and Medicaid. United States ex rel. Schuhardt v. Washington University, 228 F.Supp.2d 1018 (E.D.Mo.2002). Thereafter, the Court limited initial discovery to information surrounding the fifteen patient care cases that were specifically mentioned in plaintiffs' amended complaint.
Defendant brings this motion for summary judgment arguing that plaintiffs cannot prove any of the fifteen specific allegations of fraud alleged in the complaint. Defendant also argues that plaintiff Schuhardt's allegations of retaliation fail to state a claim. Defendant argues that granting the summary judgment motion would dispose of the specific fraud allegations; therefore, the Court should then proceed to dismiss the action under Rule 9(b) for failure to plead fraud with particularity.
II. Legal Standard
Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir.1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). Rule 56(c) "mandates *997 the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
III. Discussion
Plaintiffs initially argue that defendant is not entitled to summary judgment because there are material issues of fact as to whether defendant failed to properly document the medical services for which it sought reimbursement. The Court will address this argument before addressing the issue of whether defendant is entitled to summary judgment on the merits of the plaintiffs' specific allegations of fraud.
A. Documentation Requirements Under Medicare and Missouri State Law
Plaintiffs have argued that documentation requirements under both Missouri law and Medicare create a factual dispute regarding the truth of the University's claims for payment. Not only do plaintiffs contend that services performed by attending physicians cannot be billed unless they are properly documented, but they also assert that failure to properly document the services provided constitutes knowingly submitting a false claim under the FCA. This case, however, is not about documentation requirements. Plaintiffs do not allege in their amended complaint that defendant failed to document its medical records correctly or that defendant wrongfully received reimbursement as a result of incorrect documentation. Instead, plaintiffs have claimed that defendant knowingly submitted false claims to the government by billing for surgical procedures and other medical services that were performed by residents without the presence of an attending physician.
In order to state a claim under the FCA a plaintiff is required to establish: (1) that the defendant submitted a claim for payment to the federal government; (2) the claim was false or fraudulent; and (3) the defendant submitted the claim "knowing" that it was false or fraudulent. 31 U.S.C. § 3729; Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 563 (8th Cir.1997). A court must be careful to recognize a distinction between mistakes, on the one hand, and fraud on the other. See United States ex rel. Quirk v. Madonna Towers, Inc., 278 F.3d 765 (8th Cir.2002) (innocent mistakes and negligence are not actionable under the Act). Although plaintiffs couch their documentation arguments in the context of "creating a genuine issue of material fact," it appears that what they are actually arguing is that failure to document medical services correctly is, in essence, submission of a false claim to the federal government. By making this argument, plaintiffs attempt to use the FCA as a means to enforce regulatory compliance for federally-funded health care programs such as Medicare and Medicaid. Yet, plaintiffs have failed to show that regulatory compliance, or proper documentation in this case, is a condition to receiving payment from the government.[1] Further, failure to properly document a service does not, by itself, state a claim for relief under the FCA. Nevertheless, the Court will address *998 plaintiffs' arguments regarding documentation.
Plaintiffs first argue that defendant's own guidelines dictate that a failure to properly document creates a genuine issue of material fact from which a jury could conclude that defendant falsely billed federal programs. Plaintiffs rely on the deposition testimony of a Washington University employee, Jamie Sauerburger, as support for their contention. Plaintiffs point to Ms. Sauerburger's testimony that it was the University's policy that if something was not documented "it didn't happen." As defendant points out, however, Ms. Sauerburger further testified, "So if the documentation is not there and they can't go back to the attending and find out if they were there or not, then not to bill it." Nothing in Ms. Sauerburger's testimony indicates that a policy of false billing existed. Indeed, as defendant asserts, it appears from Ms. Sauerburger's testimony that the University utilized evidence outside the medical record to clearly determine whether a service was provided by the attending physician. Moreover, Ms. Sauerburger stated that if the defendant was unable to ascertain whether the attending physician was present at the time the service was rendered, then defendant did not bill for those services.
Plaintiffs next argue that Medicare documentation requirements were such that a jury could conclude that defendant's failure to comply with the requirements meant that defendant knowingly falsely billed Medicare. Again, as the Court stated above, plaintiffs have failed to show that a lack of proper documentation precludes reimbursement by Medicare. Nonetheless, the Court will examine the Medicare documentation requirements for the relevant periods.
As defendant notes, Medicare documentation requirements were sparse during the time periods relevant to the fifteen specific incidents alleged in the amended complaint. For the period prior to July 1, 1996, teaching physician documentation to support a global surgery charge was governed by Intermediary Letter 372. See Bureau of Health Insurance Intermediary Letter No. 372 ("IL-372") (1969). IL-372 required that documentation of personal and identifiable services be demonstrated by notes and orders in the patient's records that were either written by or countersigned by the supervising physician. For the period after July 1, 1996 42 C.F.R. § 415.172(b) provides that:
the medical records must document the teaching physician was present at the time the service was furnished. The presence of the teaching physician during procedures may be demonstrated by the notes in the medical records made by a physician, resident or nurse.
As defendant states, further guidance on documentation was not issued by the Center for Medicare and Medicaid Services (CMS)[2] until well after the medical services at issue in the complaint had been performed. Thus, contrary to plaintiffs' assertions, there was no requirement, during the relevant time period, that the teaching physician document in the medical record which preoperative or postoperative services were key. Nor was there a requirement, during the relative period, that a teaching physician document in the medical record which portions of a surgical procedure were critical, the physician's availability during non-critical portions of the procedure, or the identity of the physician *999 who was available to step in during the teaching physician's absence during non-critical portions of a surgical procedure.[3]
Plaintiffs next argue that the documentation standards for coding evaluation and management services should apply to the issues in this case. As defendant has pointed out, these standards are applicable to the assignment of a billing code for office visits and do not address documentation for billing teaching physician surgical services. Moreover, these standards do not require the identification and documentation of a key portion of a surgical procedure. As a result, they have no applicability to the case at hand.
Plaintiffs also argue that Missouri Department of Health regulations establish documentation requirements for reimbursement purposes. Plaintiffs cite 19 C.S.R. § 30-20.021.3(D) for the assertion that a hospital's medical staff must document patient care in a timely manner. That section provides that "[p]atient care by members of the medical staff, nursing staff and allied health professionals, shall be entered in the patient's medical record in a timely manner." This regulation merely governs the organization and management of hospitals. It does not dictate documentation requirements necessary for reimbursement under Medicare or even Medicaid. Thus, the Court does not believe it applies to the issues in this case. Moreover, even if the regulation were applicable to the case at hand, it does not specify what types of information are required to be entered into the medical record, who must enter the information or what constitutes a "timely manner." Plaintiffs contend that the regulation requires that medical staff by-laws establish the criteria for the content of medical records and their timely completion. See 19 C.S.R. § 30-20.021.2.(C).13. Plaintiffs assert that "[t]o date, defendant has not produced a copy of the Barnes-Jewish Hospital's Staff By-Laws which set forth the requirements for their Attending Physicians' staff privileges at that hospital, even though it agreed to do so in its Response to Plaintiffs' Motion to Compel filed on July 15, 2002."[4][5] Regardless of *1000 whether the staff by-laws define "timely manner," the Court believes that § 30-20.021.2.(C).13 does not apply in this case. Again, it does not dictate documentation requirements necessary for reimbursement under Medicare or Medicaid, but instead provides guidance as to the organization and management of hospitals in Missouri. Thus, the Court is hard-pressed to see how an alleged failure to comply with Missouri hospital organization and management rules could show that defendant knowingly submitted a false claim to the federal government.
Plaintiffs next suggest that the Missouri Medicaid rules establish documentation requirements that were violated in the case of the patients identified in paragraphs 76 and 83 of the amended complaint. Relying on an affidavit of Pam Jarrett, a Missouri Medicaid employee, plaintiffs contend that the Missouri Medicaid Physician Provider Manual established the documentation standards governing the medical records in this case. However, the Court notes that Ms. Jarrett herself states that there were no Medicaid standards expressly governing teaching physicians until § 13.18B of the Manual, "Residents in Teaching/Clinical Setting," was adopted in August 2002. Although Ms. Jarrett expresses the opinion that prior to the adoption of the 2002 rules governing teaching physicians Missouri Medicaid followed federal Medicare guidelines, neither Ms. Jarrett nor plaintiffs have been able to point to any Medicaid rule requiring a teaching physician to document in the medical record which portions of surgeries are key, whether preoperative or postoperative care is key, for which portions of surgeries they were present or who was available to take over during non-key portions of surgeries. Thus, the Court finds that Missouri Medicaid rules did not establish documentation standards for the patients identified in paragraphs 76 and 83.
Having clarified the applicable documentation requirements, the Court will turn to plaintiffs' specific allegations of fraud.
B. Plaintiffs' Specific Allegations in the Amended Complaint
As discussed above, to state a claim under the FCA a plaintiff is required to establish that the defendant submitted the claim "knowing" that it was false or fraudulent. 31 U.S.C. § 3729; Rabushka, 122 F.3d at 563. "[O]nly those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly considered `claims' within the meaning of the FCA." Costner v. URS Consultants, Inc., 153 F.3d 667, 677 (8th Cir.1998). Innocent mistakes and negligence are not actionable under the FCA. Quirk, 278 F.3d 765. With this overall standard in mind, the Court will address *1001 each of plaintiffs' specific allegations in the complaint.
1. Pre-July 1, 1996 Medicare Cases
Paragraphs 79, 81, 84, 85, 86, 87 and 88 of the amended complaint concern allegations of fraud regarding global billing for surgeries that occurred prior to the enactment of the teaching physician regulations on July 1, 1996. As the Court held in its August 20, 2002 Memorandum and Order, from 1967 to June of 1996, Medicare required a teaching physician to either personally perform an identifiable service or be physically present when the resident performed the identifiable service for which payment was sought, including both surgical services and pre- and postoperative services, in order to obtain a global fee reimbursement under Medicare Part B. Schuhardt, 228 F.Supp.2d at 1031-1032. With regard to documentation requirements for these allegations, as the Court noted above, IL-372 states that documentation of personal and identifiable services must have been demonstrated by notes and orders in the patient's records that were either written by or countersigned by the supervising physician.
A review of defendant's motion for summary judgment and plaintiffs' response shows that the parties disagree greatly over whether before July 1, 1996 Medicare imposed a requirement that a teaching physician be present each time a patient was seen by a resident or intern postoperatively in order to properly bill Medicare. The Court feels that this issue must be addressed before delving into plaintiffs' specific allegations of fraud.
It appears from their allegations that plaintiffs believe that the standard for global fee reimbursement for pre-July 1, 1996 surgeries must be: Was the teaching physician present each time a resident saw a patient postoperatively? Thus, plaintiffs believe that if a resident saw a patient even once postoperatively without the presence of a teaching physician then defendant could not bill Medicare for the entire global surgical fee without reducing the bill by attaching an appropriate split care modifier. Plaintiffs contend that this is so even if the attending physician also saw the patient postoperatively, but at a separate time.[6]
The Court's prior ruling cannot be interpreted as establishing so rigid a standard. As explained in the August 20, 2002 Memorandum and Order, it is this Court's interpretation of the Medicare regulations that Medicare required, from 1967 to June of 1996, a teaching physician to either personally perform an identifiable service or be physically present when the resident performed the identifiable service for which payment was sought. Plaintiffs seem to believe that "the identifiable service for which payment was sought," when speaking of a global surgical fee, must include any and all visits to the patient during his or her time in the hospital. Defendant argues that the critical question is not whether residents saw patients postoperatively from time to time, but rather whether the teaching physician's involvement indicated his presence at the specific times the identifiable service for which the payment was sought was rendered. Defendants also state their interpretation of the standard another way: Was the teaching physician present at each postoperative visit that required the presence of a teaching physician? It seems that defendant is asking the Court to determine which postoperative *1002 visits required the presence of a teaching physician, while plaintiffs are asking the Court to find that all postoperative visits, or at least those postoperative visits that occurred prior to a patient's discharge from the hospital, required the presence of a teaching physician. Neither side has pointed to any law that specifically dictates the appropriate standard to apply in this situation, but both parties try to extrapolate the standard from the Medicare rules and regulations in effect before July 1, 1996. Thus, the parties are asking the Court once again to deduce the effect of global billing on reimbursement of postoperative care without the benefit of any set regulations.
Central to plaintiffs' contention is the theory that an appropriate split care modifier should have been attached to a bill if a resident saw a patient even once postoperatively without the presence of a teaching physician. Defendant contends that plaintiffs fail to understand the scope of modifiers and their relation to the reduction of the global surgical fee, and thus, plaintiffs' allegations fail as a matter of law. In response to this argument, plaintiffs point to a Medicare News Bulletin issued in 1991 by Medicare carrier General American[7], as evidence that defendant should have attached a split care modifier to its billing when its teaching physicians did not provide "required post-surgical in-hospital services." Plaintiffs assert that:
In this bulletin, General American explains that the 54 modifier covers preoperative, surgical and postoperative in-patient services. It requires the surgeon to provide pre-discharge postoperative services.
A review of the bulletin leads the Court to conclude that plaintiffs have been somewhat liberal in their summarization of its contents. A full reading of the bulletin reveals no requirement that a surgeon provide pre-discharge postoperative services. What the bulletin actually states is;
Modifier -54...is used when the surgeon performs preoperative, intraoperative and postoperative hospital services, i.e. postoperative care prior to discharge. Modifier -55 for Medicare services is used when postoperative post-hospital discharge care is provided.
Plaintiffs interpret the above to mean that an attending physician can bill globally, without modifier -54, only if he or she has provided pre-discharge postoperative services in addition to the preoperative services and surgery itself. Thus, plaintiffs assert that a surgeon must use modifier -54 if he or she did not provide any pre-discharge postoperative services. Plaintiffs believe that defendant's doctors should have used this modifier even if the surgeons provided post-discharge postoperative services. Defendant interprets the above to mean that a surgeon is entitled to the entire intraoperative portion of the global fee regardless of whether he or she provides pre-discharge postoperative care,[8] *1003 and that modifier -54 should only be used if a surgeon does not provide post-discharge postoperative care.
The Court need not decide whether defendant is entitled to the entire intraoperative portion of the global fee regardless of whether the surgeon provides pre-discharge postoperative care, because the "split-care" modifiers do not apply to the allegations in this case. The bulletin plaintiffs have attached to their pleadings teaches that a split care modifier, like modifiers -54 and -55, should be used if "physicians ... furnish only part of the global package." The bulletin goes on to define a global surgery package as "the preoperative, intraoperative and postoperative execution of a surgical procedure by a single provider." Thus, the bulletin instructs that certain "split care modifiers" should be used to reduce the global fee if the above services are not rendered by a single provider. Nowhere in the bulletin does it state that services given to patients by residents qualifies as "split care" or that a resident's services provided in combination with a teaching physician's services means that the services were not rendered "by a single provider." In fact, as the Court has already held, a service provided by a resident alone cannot be billed to Medicare Part B, See generally Schuhardt, 228 F.Supp.2d at 1024-1025. Thus, there is ample evidence that services provided by a resident and teaching physician in combination are actually services provided by a single provider. Thus, the Court cannot agree that defendant should have attached a "split care modifier" to its billing when a resident saw a patient without the presence of a teaching physician.
Having decided that the split care modifiers do not apply to the instances alleged in this case, the Court notes that plaintiffs have not identified a different type of modifier that deals with global billing and resident care. Specifically, plaintiffs have not identified a modifier that should be used if a resident even once sees a patient outside the presence of an attending physician during the postoperative period. Nor have plaintiffs identified a modifier that should be attached to a global bill if the surgeon did not provide pre-discharge postoperative care, but did provide post-discharge postoperative care. Thus, the Court finds itself on familiar ground, again trying to gauge the interaction between global billing regulations and teaching physician presence requirements with no concrete standards to go by. In an effort to make an informed ruling on whether or not the global fee should have been reduced if a resident saw a patient even one time postoperatively without the presence of a teaching physician, the Court will again turn to IL-372.
At the time the global fee policy was adopted, IL-372 provided the only guidance on physician presence. The letter stated:
If the physician acted as the attending surgeon but did not render the pre- or post-surgical services generally performed by a private surgeon to a private patient, the difference in service should be reflected in the amount of reimbursement. IL-372 at B.1.
As defendant points out, the difficulty in attempting to seek guidance regarding the application of the global surgical billing policy to teaching physicians from IL-372 lies in the fact that IL-372 was written in 1969 and the global billing policy was adopted in 1992. As defendant states:
IL-372 required that the teaching physician demonstrate an attending physician *1004 relationship with the patient to qualify for Part B reimbursement for the duration of a patient's hospital stay. IL-372 also indicated that only one physician at a time could qualify as the attending physician for a particular patient. Thus, the statements of IL-372 were directed to the question of how to demonstrate an attending physician relationship to qualify for reimbursement for the entire hospital stay. Over time, CMS dropped the attending physician requirement. While it was not formally rescinded until the announcement of the 1996 teaching regulations "the formal abandonment of the rule in 1995 followed decades of disuse." See July 11, 1997 Letter of Harriet Rabb, General Counsel, Department of Health and Human Services, at p. 4, n. 12. Therefore, IL-372 provides, at best, limited insight into the requirements of CMS's global billing policy.
Although the Court agrees that IL-372 provides very limited insight into the interaction between global surgical billing and teaching physician presence requirements, the Court is still left to determine in this case whether defendant should have reduced its global bill if a resident saw a patient at any time postoperatively outside the presence of the teaching physician, or as defendant frames the issue, whether the teaching physician's involvement was such that he or she was entitled to the full global fee. Defendant contends that the answer to this question hinges on the true meaning of the phrase "identifiable service for which payment is sought."
Defendant argues that when a provider bills a global surgical fee, the services for which payment is sought are the performance of the surgery and the attending physician's involvement in preoperative and postoperative care. According to defendant, the global fee itself was never intended to include any type of payment for services provided by a resident physician without direct supervision; these "encounters are not services for which payment is sought and, therefore, the teaching physician's lack of involvement in those services does not warrant a reduction in the global fee." Defendant points to the history of the global billing policy as justification for its contentions.
In its comments on the proposed regulations surrounding global billing, see 56 Fed.Reg. 59502 (November 25, 1991), CMS clarified that the global surgical fee was not intended to dictate to the physicians the type or quantity of medical care that should be provided in any given situation. Responding to a concern that the global billing policy interfered with the practice of medicine, CMS explained:
We do not agree that the creation of global fees for surgical procedures interferes in the practice of medicine ... The global fee definition does not in any way restrict the nature of the services furnished or the number of visits the physician furnishes to the beneficiary as part of the global package. Rather, the global fee compensates for the physician's services typically associated with the surgery and is based upon the typical amount of work included in the global period. 56 Fed.Reg. 59502, 59591 (1991).
In response to a concern that the global fee would not be fair compensation in situations where the patient required an extraordinary amount of postoperative care, CMS stated:
We agree that not all patients require the same amount of postoperative care. While some do require more than the usual amount of care, others require less than the usual amount, and the amount of postoperative care will thus average out over time and patient population. The global surgery RVUs are for the typical patient, and thus are intended to *1005 cover both easy and difficult cases. 56 Fed.Reg. 59502, 59590-59591 (1991).
After a review of the Federal Register, the Court agrees that the global fee does not depend upon the physician providing a certain number of postoperative visits. Rather, the global billing policy takes into account the fact that the number of required physician visits will vary from patient to patient. Thus, as defendant argues, "implicit in this policy is the understanding that, ultimately, the nature of the postoperative care is a medical decision and must be made by the teaching physician." It is for this reason that the Court concludes that the phrase "identifiable service for which payment is sought," when looked at in relation to postoperative services, must be determined by the person most knowledgeable about medical services  the physician.[9] If a teaching physician either personally provided the postoperative visits that he or she felt were identifiable services necessary for reimbursement for that specific patient, or was present when the necessary postoperative visits were provided by a resident, then defendant properly billed Medicare.[10] The Court makes this finding as a result of two considerations: (1) the failure of Medicare regulations to speak directly to this issue and (2) the Court's hesitance to substitute its own interpretation of "identifiable services" for that of trained physicians. Furthermore, in light of the confusion surrounding the billing requirements for global billing of surgical services provided by teaching physicians in combination with residents, the Court feels compelled to make one last observation. When reviewing the specific allegations regarding services rendered to patients before July 1, 1996, the Court will be mindful that there is no evidence of fraud if the defendant's interpretation of the applicable regulations is reasonable even though incorrect. United States v. Whiteside, 285 F.3d 1345, 1350-1351 (11th Cir.2002); see also United States v. Adler, 623 F.2d 1287, 1289 (8th Cir.1980).
With all of the aforementioned in mind, the Court will evaluate plaintiffs' specific allegations of Medicare fraud which occurred prior to July 1, 1996.

Paragraph 79
Paragraph 79 of the complaint alleges that a patient identified as R.J.F. was admitted to Barnes Hospital on 6/11/96. Plaintiffs allege that defendant billed Medicare for a surgical consultation that was performed on R.J.F. by a resident as if an attending physician had performed it. In their summary of preliminary findings[11] plaintiffs admit that the defendant did not bill Medicare for the consultation. Therefore, the Court must award summary judgment to defendant on the allegations in ¶ 79.

*1006 Paragraph 81

Paragraph 81 of the complaint alleges, and the medical records reflect, that a patient identified as G.E.L. was admitted to Barnes Hospital on 4/26/96 and underwent an implantation of a pacemaker system by Dr. Ferguson, as well as a lobectomy (under the same anesthesia) by Dr. Sundaresan. Plaintiffs allege that defendant improperly billed Medicare a global fee for surgery performed on G.E.L. because residents performed postoperative services and because, possibly, a resident performed the surgery alone. Defendant has produced evidence that G.E.L.'s surgery was performed by both Dr. Ferguson and Dr. Sundaresan, both of whom were attending physicians, and plaintiffs have now acknowledged this. Plaintiffs have also acknowledged that the record reflects postoperative care by Dr. Sundaresan. However, plaintiffs continue to assert that residents alone performed postoperative care for G.E.L. for the implantation of the pacemaker by Dr. Ferguson.
Dr. Ferguson states in his declaration that it was his practice to see his patients postoperatively the day after surgery, but that in 1996 he did not regularly document these postoperative visits. Dr. Ferguson further states that he believes he followed this practice in the case of G.E.L.'s surgery. In addition, Dr. Ferguson notes that some postoperative involvement with G.E.L. is reflected in the postoperative orders he wrote immediately after the surgical procedure. Plaintiffs have not shown a genuine issue of material fact as to Dr. Ferguson's postoperative involvement, as they have not provided affirmative evidence from another source[12] that Dr. Ferguson did not follow his customary postoperative practices in the case of G.E.L. Instead, plaintiffs simply argue that the lack of documentation is enough to withstand summary judgment. As the Court noted above, a failure to document does not, by itself, provide evidence of submission of a false claim. Furthermore, it is the Court's finding that Dr. Ferguson complied with the documentation requirements, as outlined in IL-372, as he demonstrated that he provided some postoperative service through orders in the medical record that he signed. As such, defendant is entitled to summary judgment on the allegations in ¶ 81.
The Court notes that plaintiffs have attempted to assert new allegations against defendant in regard to the services provided to G.E.L. Plaintiffs stated in their response to defendant's summary judgment motion that they believed defendant failed to use the appropriate coding level for consultations that were performed on G.E.L. Plaintiffs did not make this allegation in their complaint, but they claim that they were "made aware" of this practice through review of the medical files turned over in discovery. The Court will not allow plaintiffs to use discovery to make new allegations against defendant. As such, these allegations will be disregarded.

Paragraph 84
Paragraph 84 of the complaint alleges, and the records reflect, that a patient identified as D.E.J. was admitted to Barnes Hospital on 5/30/96 for a bypass graft which Dr. Pasque, an attending physician, performed on 6/3/96. Patient D.E.J. was discharged from the hospital on 6/10/96. Plaintiffs allege that the global fee defendant billed to Medicare for surgery performed on D.E.J. was improper because residents performed some postoperative *1007 services. Plaintiffs admit in their summary of preliminary findings that Dr. Pasque saw D.E.J. for post-discharge postoperative care on 7/30/96. However, plaintiffs contend that the University should have reduced the global fee because an attending physician did not provide pre-discharge postoperative care. The Court has addressed this issue in detail above. Nevertheless, the record establishes that an attending physician did provide D.E.J. with pre-discharge postoperative care. Specifically, Dr. Pasque made a verbal order for physical therapy on June 4, 1996, and Dr. Kevin Murray twice evaluated D.E.J. postoperatively following his surgery.[13] Further, Dr. Pasque states in his declaration that it was his customary practice to personally evaluate surgical patients at least twice daily. Plaintiffs have not produced any evidence that Dr. Pasque did not follow this routine in the case of patient D.E.J. Thus, the Court concludes that defendant is entitled to summary judgment on the allegations in ¶ 84 of the amended complaint.

Paragraph 85
Paragraph 85 of the complaint alleges, and the medical records reflect, that a patient identified as D.N. was admitted to Barnes Hospital on 6/19/96. Dr. Cox, an attending physician, performed an emergency mitral valve replacement and aorto-coronary bypass grafting on the day plaintiff was admitted to the hospital. During the night, D.N. experienced bleeding. Dr. Cox was informed of the situation and made the decision to conduct a re-exploration. The re-exploration was done the morning of 6/20/96. Patient D.N. died in the hospital on 6/24/96. Plaintiffs allege that the global fee defendant billed to Medicare for surgery performed on D.N. was improper because residents performed the pre and postoperative services.
The record shows that patient D.N. was in critical condition when she was admitted to the hospital. Dr. Cox testified in his declaration that under those circumstances he would have conducted a preoperative examination of D.N. in the cardiac catheterization lab before she was transferred directly to the operating room. Plaintiffs do not dispute that the only preoperative care possible was performed on D.N., but instead they argue that Dr. Cox did not see D.N. postoperatively. The evidence shows that Dr. Kevin Murray not only assisted Dr. Cox in both surgeries but also provided postoperative care to D.N. on 6/20/96. Moreover, Dr. Cox states in his declaration that it was his practice to see all of his postoperative patients at least twice a day while they were in the hospital. He further states that he believes he followed this practice in the case of D.N. Plaintiffs argue that the records do not reflect this practice, but they have failed to offer any evidence that Dr. Cox did not follow his usual practice in this instance.
In their response to defendant's summary judgment motion plaintiffs assert that Dr. Cox could not have performed the re-exploration because he also performed a mitral valve replacement for patient J.R.M. on that same day, and the time period that D.N. was in the operating room partially overlapped with the time *1008 period that J.R.M. was in the operating room. Dr. Cox provides in his declaration a detailed account of the re-exploration he performed on D.N., with the assistance of Dr. Murray.[14] Dr. Cox explains in his declaration that the key portion of D.N.'s surgery would have begun almost immediately and would have taken approximately 25 minutes. Dr. Cox further explains that J.R.M.'s surgery would not have begun until approximately one hour after the conclusion of the key portion of D.N.'s surgery. Thus, it was not a physical impossibility, as plaintiffs assert, for Dr. Cox to have performed D.N.'s re-exploration. Moreover, plaintiffs have not produced any affirmative evidence to refute Dr. Cox's declaration that he performed the re-exploration.
The Court finds that defendant has refuted plaintiffs' allegations with respect to patient D.N. As such, the defendant is entitled to summary judgment on the allegations in ¶ 85.

Paragraph 86
Paragraph 86 of the complaint alleges, and the records reflect, that a patient identified as J.R.N. was admitted to Barnes Hospital on 5/29/96 for an aortic valve replacement. Plaintiffs allege that the postoperative care was provided by residents alone. Plaintiffs admit in their summary of preliminary findings that Dr. Pasque, the attending physician, saw J.R.N. for follow-up care in the clinic on 7/9/96, however, plaintiffs contend that defendant should have charged a reduced fee to reflect a lack of involvement with the patient's inpatient postoperative care. The Court has addressed this issue above. Nevertheless, the record shows that Dr. Pasque did engage in inpatient postoperative care for J.R.N. Dr. Pasque notes in his declaration that he regards the first 24 hours after surgery as a key time for monitoring postoperative complications. Dr. Pasque also state in his declaration that he personally examined J.R.N. during this timeframe, and his personal involvement in that time period is reflected in his May 30, 1996 postoperative orders for red blood cell administration and a change in the drug nitroglycerin. Furthermore, Dr. Pasque states that it was his practice to personally evaluate his surgical patients at least twice daily. He indicated that he did not feel it was necessary to document these visits because they were not billed separately. Although plaintiffs again assert that the lack of documentation of postoperative care creates a genuine issue of material fact as to whether the care was actually provided, plaintiffs have not provided any affirmative evidence that Dr. Pasque did not follow his routine practice in this case. Thus, the Court will grant summary judgment to defendant on the allegations in ¶ 86.

Paragraph 87
Paragraph 87 of the complaint alleges, and the records reflect, that a patient identified as G.V. was admitted to Barnes Hospital on 5/9/96 and underwent a coronary artery bypass. Plaintiffs allege that the global fee defendant billed for surgical services provided to G.V. was fraudulent because G.V.'s pre- and postoperative care was provided by residents alone. In their summary of preliminary findings plaintiffs admit that their allegations regarding preoperative care were incorrect. However, plaintiffs continue to assert that Dr. Ferguson, G.V.'s attending physician, did not provide inpatient postoperative care. The Court has addressed this issue above.
Dr. Ferguson states in his declaration that it was his practice to see all of his *1009 surgical patients each day that they were in the hospital. He also states that he believes it is highly likely that he followed this practice with G.V. during her hospitalization. Dr. Ferguson indicates that his personal involvement is documented through the physician orders he made for G.V. on 5/10/96 and 5/20/96. Although plaintiffs express their disbelief of Dr. Ferguson's postoperative involvement, they have not produced any evidence, such as an affidavit from a nurse, another doctor or a resident, that Dr. Ferguson did not provide postoperative care. Thus, the Court will grant defendant summary judgment on the allegations in ¶ 87.
The Court notes that plaintiffs, in their response to defendant's summary judgment motion, attempt to inject a new issue into the case regarding the services provided to patient G.V. Plaintiffs assert that the consultation performed by Dr. Ferguson was not properly coded.[15] Because plaintiffs did not make this allegation in their complaint, it will be disregarded.[16]

Paragraph 88
Paragraph 88 of the complaint alleges, and the records show, that a patient identified as M.F.G. was admitted to Barnes Hospital on 5/14/96. M.F.G. underwent a bronchoscopy, mediastinoscopy and lobectomy on 5/15/96. Plaintiffs allege that residents provided preoperative and postoperative care and that a resident performed the surgery. In the summary of preliminary findings plaintiffs acknowledge that Dr. Sundaresan, an attending physician, provided preoperative care for M.F.G., and that Dr. Sundaresan saw M.F.G. postoperatively on two separate occasions. In their response brief plaintiffs concede that Dr. Sundaresan also performed the surgery on M.F.G. In spite of these concessions, plaintiffs argue that the global fee should have been reduced because Dr. Sundaresan asked a colleague to cover for him during a vacation he took several days after M.F.G.'s surgery, yet there is no documentation indicating that the covering physician ever saw M.F.G. during that period. Dr. Patterson states in his declaration that it was common practice for the physicians in the Division of Cardiothoracic Surgery to cover for one another when a physician needed to be out of town. Plaintiffs have not provided any evidence suggesting that M.F.G. needed further postoperative care other than which was provided by Dr. Sundaresan, nor have plaintiffs provided any evidence showing that M.F.G. was not seen by an attending physician while Dr. Sundaresan was out of town. For these reasons, the Court finds that defendant is entitled to summary judgment on the allegations in ¶ 88.
2. Post-July 1, 1996 Medicare Cases
Paragraphs 75, 77, 78, 80, 82 and 89 of the amended complaint concern allegations of fraud in connection with global billing for surgeries that occurred after the enactment of the teaching physician regulations on July 1, 1996. With respect to the Medicare regulations in effect from July 1, 1996 to the present, the Court found in its August 20, 2002 Memorandum and Order that if the teaching physician *1010 decided that neither prenor postoperative services were "key" portions of the billable service, then such services could be performed by a resident without the need for a teaching physician's physical presence during the service and still be eligible for reimbursement under Medicare Part B. Conversely, if the teaching physician decided that a preoperative and/or postoperative service was a key portion, then the teaching physician must have either performed the service personally or must have been physically present during the time a resident was performing such service in order to ask for reimbursement under Medicare Part B. If the teaching physician neither physically supervised the resident in the performance of the key portion nor performed the key portion personally, then a reduced global fee had to be billed to Medicare Part B. See Schuhardt, 228 F.Supp.2d at 1031-1032. Medicare regulations, 42 C.F.R. § 415.172 state that in the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure.
With these rules in mind, the Court will evaluate plaintiffs' specific allegations of Medicare fraud after July 1, 1996.

Paragraph 75
Paragraph 75 of the complaint alleges, and the records reflect, that a patient identified as D.L.H. was admitted to Barnes Hospital on 8/23/96, underwent a lobectomy on 8/27/96 and was discharged on 8/31/96.[17] The complaint alleges that defendant improperly billed Medicare for bedside procedures that were performed on D.L.H. by residents, and that the global fee the defendant billed for Dr. Patterson's surgical involvement with D.L.H. was improper because Dr. Patterson did not provide postoperative care. Plaintiffs acknowledge in their summary of preliminary findings that defendant did not bill Medicare for the alleged bedside procedures. Plaintiffs also acknowledge in their summary that D.L.H. had a postoperative follow-up visit with Dr. Patterson within 90 days of the surgery[18], and the record reflects that this visit occurred on 9/13/96.[19] Although this evidence seems to negate plaintiffs' allegations in ¶ 75 plaintiffs assert in their response brief that D.L.H.'s surgery was improperly billed because the record does not reflect Dr. Patterson's involvement in postoperative care prior to discharge from the hospital.
In view of plaintiffs' contention, the Court feels compelled to point out that the Medicare rules, as construed by this Court in a prior opinion, do not differentiate between pre-discharge postoperative care and post-discharge postoperative care. The rules simply state that if a teaching physician believes a postoperative visit to be key, then the physician must either physically supervise a resident in his or her performance of the key portion of the care or perform the key portion personally. Thus, on this basis alone the Court believes plaintiffs' allegations to be meritless. *1011 However, the Court also notes that, contrary to plaintiffs' assertion, the record does reflect Dr. Patterson's involvement in D.L.H.'s postoperative care prior to discharge from the hospital. The record reflects that Dr. Patterson checked on D.L.H. in the recovery room fifty-five minutes after the surgery. As Dr. Patterson states in his declaration, he regards a visit to the patient in the recovery room to be a key postoperative visit. Dr. Patterson further states that in his medical judgment, the only key postoperative care required for D.L.H. was fulfilled by his visit to the recovery room on 8/27/96 and his follow-up office visit with D.L.H. on 9/12/96.
Plaintiffs also argue that defendant improperly billed the entire global fee for D.L.H. because Dr. Patterson was not present for "a key postoperative service," namely the removal of D.L.H.'s chest tube after surgery. To support their contention, plaintiffs assert that because Dr. Roper declared in his affidavit that removal of a chest tube was a key postoperative service in the case of patient J.K., then Dr. Patterson should have also regarded removal of a chest tube to be a key postoperative service. Plaintiffs misinterpret the Medicare guidelines in making this argument. According to § 15016 of the Medicare Carriers' Manual, the teaching surgeon may determine which postoperative visits are considered key and require his or her presence. Thus, Medicare allows each individual treating physician to determine for himself or herself which portions of the pre- and postoperative services are key. As defendant points out, inherent in this regulation is the recognition that the determination of a "key service" will vary from patient to patient and physician to physician. Thus, because Dr. Patterson did not designate the chest tube removal as a key postoperative service, his presence during this procedure was not required in order to properly bill Medicare.
Plaintiffs accuse Dr. Patterson of altering the records to support his contention that he provided key postoperative services for patient D.L.H. They note that some of the medical records produced by the defendant in this litigation included entries that were not present when plaintiff Schuhardt made copies of those records in October 1996. To characterize the addition of entries into the medical record as an alteration presumes a requirement that all documentation in the medical records must be entered at the time the service is rendered. As discussed above, there is no law to indicate that this is the case. As defendant notes, there is nothing sinister about the supplementation of medical records documentation as long as it is accurate. Plaintiffs have not provided any evidence suggesting that any notations that were added after October 1996 are inaccurate.
Lastly, plaintiffs make a new allegation that does not appear in the complaint with respect to patient D.L.H. Plaintiffs contend that Dr. Patterson was not present for the critical portion of D.L.H.'s surgery on 8/27/96. In support of this allegation, they note that Dr. Patterson performed a bronchoscopy and mediastinoscopy for patient N.J. on the same day as D.L.H.'s surgery. Plaintiffs note that the time D.L.H. was in the operating room overlapped with the time N.J. was in the operating room. Thus, plaintiffs contend that it was physically impossible for Dr. Patterson to have been present for the critical portion of each patient's surgery.
The record shows that patient D.L.H. was in surgery from 12:20 until 3:20 and that patient N.J. was in surgery from 1:15 until 3:05. Dr. Patterson states in his declaration that the key portions of D.L.H.'s surgery would have taken a total of 45-60 minutes (not consecutively) and that the key portions of N.J.'s surgery would have *1012 taken 25 minutes (not consecutively). Thus, it was not a physical impossibility for Dr. Patterson to have been present for the critical portions of each patient's surgery. Furthermore, Dr. Patterson's wrote the following statement on the operative note for D.L.H.'s surgery: "I was present for bronchoscopy, mediastinoscopy and left lower lobectomy." Although plaintiffs argue that this statement was added to the medical record several months after the procedure, intimating that the addition of the statement was somehow disingenuous, an after-the-fact addition of truthful information to the medical record is not evidence of an admission of a false claim. Plaintiffs have not provided any evidence showing that the notations added were not accurate. Furthermore, in his declaration Dr. Patterson asserts that he would not have written this statement if he did not believe it to be true. Dr. Patterson later states in his declaration that although "the overall timeframe for N.J.'s surgery overlapped with the overall timeframe for D.L.H.'s surgery ... after my review of the medical records for both surgeries, I believe that I was present for the key portions of each procedure performed on each patient." Plaintiffs point to Dr. Patterson's statement in N.J.'s operative report that he was present for and personally conducted the procedure entirely as evidence that he could not have been present in the critical portions of D.L.H.'s surgery. However, Dr. Patterson states in his declaration that he wrote this statement with the understanding that his reference to the "procedure" referred to the portions of the procedure that required his presence.
Plaintiffs make much of the fact that Dr. Patterson did not document in the medical records which of his colleagues was available to assist in the non-critical portions of D.L.H.'s and N.J.'s surgeries. However, Dr. Patterson states in his declaration that he did not understand the Medicare rules to require a physician to document his immediate availability, but as a matter of sound medical practice, he did not perform overlapping surgical procedures unless one or more of his colleagues in the division of cardiothoracic surgery was available to respond to an emergency. Furthermore, as the Court has already noted, this documentation requirement was not instituted until after Dr. Patterson's treatment of D.L.H.
The Court finds that based on the evidence presented, the defendant has refuted plaintiffs' allegations regarding patient D.L.H. As such, the Court will award summary judgment to defendant on the allegations in ¶ 75.

Paragraph 77
Paragraph 77 of the complaint alleges that a patient identified as H.B.S. was admitted to Barnes Hospital on or about 9/3/96, that H.B.S. was admitted for a carotid angiogram-arteriography, but that Dr. Sicard, his attending physician, did not perform the surgery. Plaintiffs also allege that the global fee that defendant billed to Medicare for surgery performed on H.B.S. was improper because residents performed pre- and postoperative services and because the attending physician was not present during the surgery. In their summary of preliminary findings plaintiffs admit that the surgery that was to occur during that hospitalization was canceled, and as a result, defendant did not bill for the services of Dr. Sicard. However, in an attempt to defeat summary judgment, plaintiffs now assert that Dr. Sicard added notations to the medical records "after plaintiff Schuhardt copied those records." As defendant argues, whether Dr. Sicard made notations in H.B.S.'s record is completely irrelevant. It is undisputed that defendant did not bill for Dr. Sicard's services. *1013 As such, defendant is entitled to summary judgment on the allegations in ¶ 77.

Paragraph 78
Paragraph 78 of the complaint alleges, and the records show, that a patient identified as W.G.F. was admitted to Barnes Hospital on 9/11/96, underwent by-pass surgery on 9/13/96 and was discharged on 9/17/96. Plaintiffs allege that the global fee defendant billed to Medicare for surgery performed on W.G.F. was improper because residents performed pre- and postoperative services and, possibly, because the teaching physician was not present during the surgery.
Defendant has produced evidence that Dr. Cox, the attending physician, saw W.G.F. preoperatively. The record indicates that Dr. Cox saw W.G.F. on 9/11/96, the day he was admitted to the hospital, at which time he indicated that the patient would undergo cardiac catheterization. At that time Dr. Cox also noted that he anticipated that the patient would need by-pass surgery. Defendant has also produced evidence that W.G.F. was seen postoperatively by a teaching physician. Dr. Kevin Murray, a member of the Division of Cardiothoracic Surgery, saw the patient postoperatively. There is also evidence that Dr. Cox saw W.G.F. postoperatively. Dr. Cox states in his declaration that he customarily saw his surgical patients each day that they were in the hospital. He testified that although he did not document these visits, it was his practice to see his postoperative patients twice a day, review their progress and make any decisions that required the involvement of an attending physician. In his declaration, Dr. Cox also states that he believes he followed this practice with W.G.F. during his hospitalization.
Plaintiffs assert that Dr. Cox could not have been present for the critical portions of W.G.F.'s surgery because he participated in a surgical procedure involving patient P.G. at substantially the same time. Dr. Cox explains in detail in his declaration how it was possible for him to be present at the critical portions of both procedures. He has also explained that he was not aware of any obligation to document his absence during non-key portions of a procedure. Yet, plaintiffs argue that Dr. Cox's statement on W.G.F.'s operative notes indicates that there is an issue of fact for the jury to decide as to whether Dr. Cox was present at W.G.F.'s surgery. In the operative notes, Dr. Cox wrote, "As the operating surgeon, I was in attendance for all portions of this operation between the opening of the chest incision and its closure." Plaintiffs assert that this statement contradicts Dr. Cox's assertion that he was present for the critical portions of both P.G.'s and W.G.F.'s surgeries. However, as plaintiffs themselves note, in his declaration Dr. Cox has clarified his operative notes as meaning that he was present for the key portions of the procedure. As Dr. Cox states in his declaration, "I would not have written this statement if I did not believe that I was present for the key portions of W.G.F.'s surgery."
Even if the Court were to conclude that there was an issue of fact as to whether Dr. Cox was present for the entire critical portion of W.G.F.'s surgery, there is other evidence that defendant did not improperly bill Medicare for W.G.F.'s surgery. The operative notes indicate that Dr. Murray was present for W.G.F.'s surgery and acted as first assistant during the surgery. Thus, defendant is entitled to summary judgment on the allegations in ¶ 78.

Paragraph 80
Paragraph 80 of the complaint alleges, and the medical records reflect, that a patient identified as S.M.W. was admitted *1014 to Barnes Hospital on 8/27/96, underwent a fiberoptic bronchoscopy and lobectomy on 8/29/96 and was discharged on 9/3/96. S.M.W. was a Medicare patient who was cared for by Dr. Patterson. Plaintiffs have alleged that residents alone provided pre- and postoperative care for S.M.W.
Plaintiffs acknowledge in the summary of preliminary findings that defendant produced a letter written by Dr. Patterson dated 8/28/96, stating that he saw the patient in consultation preoperatively. The letter bears a handwritten note dated 9/22/97 that reads, "I saw the patient in consultation 8/26/96," and that bears Dr. Patterson's signature. The plaintiffs argue that Dr. Patterson's declaration of his preoperative involvement with S.M.W. on 8/26/96 is not credible in light of the note written more than one year later. However, plaintiffs have not offered any evidence that would lead a reasonable juror to conclude that Dr. Patterson did not render the services documented in the 8/28/96 letter.
With respect to postoperative care, Dr. Patterson has stated that he made an inpatient postoperative visit to check on S.M.W. in the recovery room. Dr. Patterson also states in his declaration that, in accordance with his usual practice of seeing his patients on multiple occasions during their hospital stays, he believes that he saw S.M.W. on other occasions in the hospital prior to his discharge. The record also indicates that Dr. Patterson saw S.M.W. postoperatively in his office on 9/27/96. The Court finds that this evidence refutes plaintiffs' allegations regarding patient S.M.W. As such, the Court will grant summary judgment to defendant on the allegations in ¶ 80.

Paragraph 82
Paragraph 82 of the complaint alleges that a patient identified as D.J.F. was admitted to Barnes Hospital on or about 8/22/96, and that he underwent a bedside procedure, specifically an arterial line placement, on 8/26/96. Plaintiffs allege that the bedside procedure was performed by a resident but defendant improperly billed Medicare as though an attending physician had performed it. In their summary of preliminary findings plaintiffs concede that the defendant did not bill Medicare for the bedside procedure. Therefore, the Court will grant summary judgment to defendant on the allegations in ¶ 82.

Paragraph 89
Paragraph 89 of the complaint alleges that a patient identified as D.L.P. was admitted to Barnes Hospital on or about 8/28/96, that he underwent by-pass surgery on 8/29/96, and that he received a surgical consultation while in the hospital. Plaintiffs allege that the surgical consultation was performed by a resident, but that defendant improperly billed it to Medicare as if it had been done by an attending physician. Plaintiffs also allege that residents provided "most or all of [D.L.P.'s] postoperative care." In their summary of preliminary findings plaintiffs admit that the defendant did not bill Medicare for the surgical consultation. Plaintiffs also admit that the attending physician saw the patient one day postoperatively and at least one time in the clinic after his hospitalization. Therefore, the Court will grant summary judgment to defendant on the allegations in ¶ 89.
3. Medicaid Cases
Paragraphs 76 and 83 of the amended complaint concern allegations of fraud regarding global billing for surgeries under Medicaid. It is alleged that the services were provided in August 1996.
As discussed above, there were no Medicaid standards expressly governing *1015 teaching physicians until the adoption of § 13.18B of the Medicaid Manual, "Residents in Teaching/Clinical Setting," in August 2002. Despite the absence of such standards, defendant asserts that it is entitled to summary judgment on paragraphs 76 and 83 even under "the more stringent Medicare presence requirements." In response, plaintiffs chide defendant for "citing no authority which permitted the absence of defendant's attending physicians when services were provided by residents before August 2002." However, as defendant points out in its reply brief,
[g]iven the fact that there were no Missouri Medicaid teaching physician regulations in effect until August 2002, it is the plaintiffs who are required to inform the Court and the University exactly what it is that the University allegedly violated.
Recognizing the truth in defendant's argument, plaintiffs have tried to extrapolate from other Medicaid regulations a requirement that teaching physicians be present when a service was rendered by a resident in order to properly bill Medicaid. Thus, plaintiffs argue that because Section 13.33.A. of the Missouri Medicaid Providers Manual states that a physician's services provided in a hospital must be billed on HCFA form 1500, and because an attestation to the HCFA Form 1500 states "all services billed by the physician/clinic using the individual provider number must have been performed by the billing provider and there must be documentation in the patient's medical record for each service billed," and because only defendant's attending physicians were Medicaid providers, then it follows that defendant falsely billed Medicaid when residents performed services without the presence of a teaching physician.
Even if the Court were to adopt plaintiffs' line of reasoning, their argument fails. Again, plaintiffs have not shown that regulatory compliance with the "standard" they claim existed was a condition to receiving payment from the government. In any event, it is undisputed that there were no Medicaid standards expressly governing teaching physicians until § 13.18B of the Medicaid Manual, "Residents in Teaching/Clinical Setting," was adopted in August 2002. Thus, prior to that date defendant could not have knowingly submitted a false claim to Medicaid for any services rendered by a resident outside the presence of a teaching physician. Therefore, defendant is entitled to summary judgment on the allegations in paragraphs 76 and 83 of plaintiffs' amended complaint.
4. Wound Healing Clinic
In paragraphs 53 and 54 of the amended complaint plaintiffs allege that in the Wound Healing Clinic, all wound cleaning was done by a nurse named Laurel but billed under the name of an attending physician, Dr. Kraemer. In the August 2002 Memorandum and Order, the Court determined that the allegations regarding Dr. Kraemer in paragraphs 53 and 54 of the amended complaint were sufficient to state a claim. See Schuhardt, 228 F.Supp.2d at 1033. The Court went on to state that, "if, as defendant asserts, the Wound Clinic patient identified in paragraph 54 of the amended complaint was privately insured, the defendant may present evidence of that in support of a motion for summary judgment." Because defendant has put forth evidence that the patient identified in paragraph 54 was, in fact, privately insured, defendant is entitled to summary judgment with respect to the allegations regarding the Wound Healing Clinic.
Plaintiffs admit that they did not identify a specific patient for whom defendant billed Medicare under the name of Dr. Kraemer for services actually performed by nurse Laurel, yet they still attempt to argue that their unspecific allegations regarding *1016 the Wound Healing Clinic should stand. The Court will address plaintiffs' inability to make specific allegations in Section D. below.
C. Plaintiff Schuhardt's Retaliation Claim
The FCA prohibits employment discrimination "because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under [the FCA]." 31 U.S.C. § 3730(h). The elements of a retaliation claim under the FCA are (1) the plaintiff was engaged in conduct protected by the FCA, i.e., acts done in furtherance of an action under § 3720; (2) the defendant was aware of, or had knowledge that, the plaintiff was engaged in such conduct; (3) the defendant discriminated against the plaintiff in retaliation for engaging in such conduct; and (4) the retaliation was motivated solely by the plaintiff's protected activity. Norbeck v. Basin Electric Power Cooperative, 215 F.3d 848, 850 n. 2 (8th Cir.2000); Wilkins v. St. Louis Housing Authority, 314 F.3d 927, 932-933 (8th Cir.2002). Several courts have indicated that the "knowledge prong" of part two of the prima facie case requires the employee to put his employer on notice of the "distinct possibility" of FCA litigation. See U.S. ex rel. Yesudian v. Howard University, 153 F.3d 731, 740 (D.C.Cir.1998); Childree v. UAP/GA CHEM, Inc., 92 F.3d 1140, 1146 (11th Cir.1996); Adler v. Continental Ins. Co., 1996 WL 677085 (D.Kan.1996), affirmed, 133 F.3d 932, 1998 WL 10232 (10th Cir.1998); Hopper, 91 F.3d at 1269; Neal v. Honeywell, Inc., 33 F.3d 860, 864 (7th Cir.1994); Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 188 (3rd Cir.2001), cert. denied, 536 U.S. 906, 122 S.Ct. 2360, 153 L.Ed.2d 182 (2002); U.S. ex rel Farrell v. SKF USA, Inc., 204 F.Supp.2d 576 (W.D.N.Y.2002). To prove the notice element of a § 3730(h) claim, an employee is "required to present evidence from which a jury could reasonably find that defendant was on notice that plaintiff was either taking action in furtherance of a private qui tam action or assisting in an FCA action brought by the government." U.S. ex rel. Yesudian v. Howard University, 946 F.Supp. 31, 33 (D.D.C.1996). A qui tam plaintiff may satisfy the notice element explicitly or implicitly. See Luckey, 2 F.Supp.2d at 1054. She can expressly indicate to the employer that she is either assisting the government in a FCA action or contemplating her own qui tam action. Id.
Defendant argues that plaintiff Schuhardt has failed to show that she put the defendant on notice of the distinct possibility that she intended to take her complaints to the government. Plaintiff Schuhardt testified in her deposition that she did not say anything to anyone at the University about initiating a qui tam action. Thus, the Court must evaluate whether plaintiff Schuhardt engaged in conduct sufficient to put defendant on notice of a possible FCA action. Id. [citing Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 952 (5th Cir.1994)]. Courts have indicated that to some extent there is a merger between showing involvement in a protected activity and proving that the employer had notice. Thus, the Court will also address whether plaintiff engaged in "protected activity."
The first element of a § 3730(h) claim is that the employee's conduct be protected by the FCA. "Congress made clear that whistle-blower protections should extend to almost any type of activity, `including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed.'" Luckey, 2 F.Supp.2d at 1050 [quoting Hopper, 91 F.3d at 1269]; United States ex rel. McKenzie v. BellSouth Telecommunications, Inc., 123 F.3d 935 (6th Cir.1997). However, an employee's purpose *1017 for engaging in the activity must be "in furtherance of an action" under the FCA. See Hopper, 91 F.3d at 1269. "The purpose of the employee's investigatory activity must contain at least some ingredient of uncovering fraudulent activity." Luckey, 2 F.Supp.2d at 1051. In Hopper, 91 F.3d at 1269, the court wrote that the "in furtherance of" language extends to situations where "a plaintiff is investigating matters which are calculated, or reasonably could lead to a viable FCA action." The Hopper court noted that the "reasonably could lead language" fell short of extending to situations where the employee was neither "trying to recover money for the government" nor "investigating fraud." Id. Thus, an employee's activities that are not related to exposing or deterring fraud, are not "whistle blowing as envisioned in the paradigm qui tam FCA action." Id. After reviewing plaintiff Schuhardt's deposition testimony, the Court believes that she did not engage in protected activity that was in furtherance of a qui tam action.
Plaintiff testified that her job as a coder entailed abstracting the medical chart and "cod[ing] what the physician had done and then mak[ing] a bill." Plaintiff testified that she was also responsible for "checking the completeness of the documentation" in the medical chart, and if the appropriate documentation was missing from the medical chart, trying to obtain that documentation. In fact, during the Department of Surgery's large scale review of files, which occurred in late 1996 and early 1997, "checking the completeness of documentation" in the medical files and contacting the attending physicians to obtain the necessary documentation was central to plaintiff's job duties. As her deposition testimony illustrates, plaintiff's "investigatory activity" consisted of checking the completeness of documentation in the medical files she was coding and contacting the attending physicians who serviced the patients named in those files to obtain the necessary documentation to bill. These investigatory activities were identical to plaintiff's job duties. Thus, they were not done in furtherance of uncovering fraudulent activity. See, e.g., Robertson, 32 F.3d at 950-952 (holding that a plaintiff must be investigating fraud in order to bring a FCA suit to be protected under § 3730(h)). Even if plaintiff's actions were done in furtherance of a qui tam action, there is no evidence that defendant knew that plaintiff intended to use her knowledge in furtherance of an FCA action.[20]
Several courts have held that if an employee is assigned the task of investigating regulatory compliance or fraud within the company, the employee must make it clear that the her actions go beyond the assigned task in order to overcome the presumption that the employee was merely acting in accordance with their employment obligations. See Eberhardt v. Integrated *1018 Design & Construction, Inc., 167 F.3d 861, 868 (4th Cir.1999); U.S. ex rel Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523 (10th Cir.1996); Yuhasz v. Brush Wellman, Inc., 181 F.Supp.2d 785, 795-796 (N.D.Ohio 2001); Robertson, 32 F.3d at 952; Faldetta v. Lockheed Martin Corp., 2000 WL 1682759 (S.D.N.Y.2000). The Court believes that plaintiff Schuhardt's job duties included the task of investigating and substantiating regulatory compliance. Indeed, she was told that before she could bill for surgical services she had to first ascertain whether the doctors who provided the services had properly documented their involvement. Thus, the Court believes that plaintiff Schuhardt's actions must have gone beyond her assigned tasks in order to show notice of the distinct possibility of a qui tam action. As noted above, the Court does not believe that plaintiff's actions went beyond her assigned tasks, such that defendant would have had notice of a qui tam action.
Plaintiff's counsel argues that plaintiff Schuhardt did give notice of the distinct possibility of suit to defendant when she told her supervisor, Kevin Gagen, in 1995 that defendant's billing practices were "illegal" and "fraudulent." During a staff meeting in 1995, Mr. Gagen told the coders that they should start billing from the operative notes without first looking through the medical chart. When plaintiff questioned him about this, Mr. Gagen replied that the billing process often lagged five to six months behind because of the length of time the coders had to wait to get the medical charts they needed for billing. In her deposition, plaintiff testified that she told Mr. Gagen she felt this practice of billing from the operative notes was "illegal" and "fraudulent."[21] Although it appears that plaintiff lodged a complaint about defendant's billing practices, she failed to indicate a nexus between her complaint and the FCA. She did not suggest to defendant that she intended to use her allegations in furtherance of a FCA action, and she gave no indication that she was going to report any improprieties to the government.
Plaintiff also argues that she provided the requisite notice when she told her new boss, Ms. Sauerburger, that the billing practices were "fraudulent." Again, in order to determine whether defendant had notice of a distinct possibility of a FCA action, it is important to examine plaintiff's conversation with Ms. Sauerburger in the context in which it occurred. Ms. Sauerburger became plaintiff Schuhardt's supervisor in mid-1996. At that time, Ms. Sauerburger met with each of the coders individually to discuss, according to plaintiff, "things that we felt were not right within the department." Plaintiff testified that during her meeting, she told Ms. Sauerburger that she felt "the physicians signing six and seven and eight months after the fact was not right," and that the coders needed some clear-cut guidelines to go by. Plaintiff stated that she also told Ms. Sauerburger, "If the OIG [Office of Inspector General] would come in they would frown upon us and they'd pretty much wipe us out."[22] During her *1019 conversation with Ms. Sauerburg plaintiff never once stated or even suggested that she intended to use her allegations in furtherance of a FCA action. A passing reference to an unfavorable review of defendant's practices by a government does not constitute notice of a distinct possibility of an FCA action.
The deposition testimony of the plaintiff and her supervisors reveals no evidence that defendant was aware that plaintiff had contacted or was planning to contact the government, that she was investigating possible fraud or that she was even contemplating participation in a fraud investigation. Thus, the Court finds that defendant did not have notice of the distinct possibility that plaintiff was contemplating an action under the FCA. As such, defendant is entitled to summary judgment on plaintiff Schuhardt's claim for retaliation.
D. Failure to Plead Fraud with Particularity
Defendant argues that if summary judgment is granted on the fifteen specific allegations in plaintiffs' complaint, then the Court must dismiss plaintiffs' complaint for failure to plead fraud with particularity, pursuant to Federal Rule of Civil Procedure 9(b).
Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Under Rule 9(b), "circumstances" includes "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549 (8th Cir.1997) quoting Commercial Property Invs., Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir.1995). "Particularity" means "the who, what, when, where and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627-628 (7th Cir.1990).
As defendant notes, courts have generally applied Rule 9(b) in FCA cases to ensure that plaintiffs have substantial pre-discovery evidence of the fraud alleged in the complaint. See Harrison v. Westinghouse Savannah River Company, 176 F.3d 776, 784 (4th Cir.1999); Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir.2001). For this reason, on December 10, 2001, the Court directed the plaintiffs to amend their original complaint by alleging specific incidents of fraud. On January 9, 2002, plaintiffs filed an amended complaint which contained the fifteen specific allegations of fraud discussed above. The Court, in an effort to ascertain whether the plaintiffs would be able to state a claim, permitted the parties to proceed with limited discovery on the fifteen specific allegations in the complaint. Because the Court has now concluded that none of plaintiffs' specific allegations show any fraudulent behavior by defendant, dismissal of the amended complaint for failure to plead fraud with particularity is appropriate.
Plaintiffs assert that they are entitled to continue with this case because they will later seek to amend their complaint further to include new claims of fraud that they "uncovered" during discovery. The Court will not allow this case to continue as a fishing expedition in search of a fraud claim. As the Fifth Circuit noted, "[a] special relaxing of Rule 9(b) is a qui tam plaintiff's ticket to the discovery process that the statute itself does not contemplate." United States ex rel. Russell v. Epic Healthcare Management Group, 193 F.3d 304, 309 (5th Cir.1999); see also, United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1052 (9th Cir.2001); United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 *1020 F.3d 899, 903 (5th Cir.1997). Plaintiffs also contend that the exhibit attached to their amended complaint titled "Medicare Claims Sent Before Review  Need to Review List" provides enough specific allegations to proceed with the present case. The Court disagrees
In her deposition, Ms. Sauerburger testified that there was a change in the Medicare rules in July of 1996 that caused defendant to pause and re-evaluate its billing practices to make sure defendant was in compliance with the new Medicare regulations.[23] At that time, defendant put a hold on all Medicare billings.[24] Ms. Sauerburger testified that the "Medicare Claims Sent Before Review  Need to Review List" was generated after some claims were mistakenly submitted to Medicare for reimbursement, during the hold on Medicare billings, before the medical charts were checked to see if they had "documentation adequate to bill." Thus, this list was given to coders like plaintiff Schuhardt to go back and check the medical charts that corresponded with the claims to see if proper documentation existed in the medical charts to support the billing to Medicare. If the coders found that documentation was not sufficient, they were supposed to "refund Medicare" or "if it was an operative note that didn't have the proper documentation, the instructions at that time were to take it to the physician, make sure they remembered ... the case and sign the date that they were signing in and referring back to the operative date or the date of the dictated note."[25] Further, and most telling, Ms. Sauerburger testified that if the coders "found improper documentation and the physician couldn't recall providing that service then it [the payment] was refunded to Medicare." Thus, there is no evidence that the "Medicare Claims Sent Before Review  Need to Review List" contains any specific allegations of fraud. At this juncture of the case, the Court finds plaintiffs' inability to make specific allegations of fraud to be fatal to their case. Thus, the Court will grant defendant's request to dismiss the amended complaint for failure to plead fraud with particularity.
E. Plaintiffs' Rule 56(f) Motion
Plaintiffs move the Court under Rule 56(f) to defer ruling on defendant's summary judgment "so that additional discovery in this case may be taken." Plaintiffs ask that they be allowed time to conduct discovery regarding the "Medicare Claims Sent Before Review  Need to Review List." Plaintiffs contend that this list illustrates the "large-scale cover-up" of the types of fraudulent billing upon which this case is premised. Plaintiffs do not ask, in their 56(f) motion, for more time to conduct discovery on the fifteen cases of fraud specifically identified in the complaint. Thus, plaintiffs fail to recognize the purpose of a Rule 56(f) motion. As defendant points out, a Rule 56(f) motion provides a remedy for a litigant who has not had the *1021 opportunity to conduct the discovery necessary to prepare a meaningful opposition to a summary judgment motion. See Dulany v. Carnahan, 132 F.3d 1234, 1238 (8th Cir.1997); Alexander v. Pathfinder, Inc., 189 F.3d 735, 744 (8th Cir.1999). Plaintiffs have submitted a 53-page response to defendant's summary judgment motion; thus, they have had an adequate opportunity to prepare an opposition to the motion. Further, the information that plaintiffs request, namely discovery surrounding the "Medicare Claims Sent Before Review  Need to Review List," has nothing to do with the fifteen specific allegations addressed in defendant's summary judgment motion. Therefore, the Court will deny plaintiffs' Rule 56(f) motion.
F. Defendant's Counterclaims Against Plaintiff Schuhardt
On September 4, 2002 defendant filed a counterclaim against plaintiff Schuhardt. The defendant's first claim is that plaintiff Schuhardt breached her fiduciary duty to defendant by disclosing confidential patient and employer information to third parties. The second claim against plaintiff Schuhardt is for replevin based on the allegation that she has possession of more than four hundred pages of confidential patient records that she wrongfully took from defendant. Both of these claims arise under state law. Pursuant to 28 U.S.C. § 1367(c)(3), a federal district court may decline to exercise supplemental jurisdiction over state law causes of action if the district court has dismissed all claims over which it has original jurisdiction. Because the claims over which the Court has original jurisdiction will be dismissed, the Court declines to exercise supplemental jurisdiction over defendant's counterclaim, and it will be dismissed without prejudice.
Accordingly,
IT IS HEREBY ORDERED plaintiffs' motion to continue discovery is denied.
IT IS FURTHER ORDERED that defendant's motion for summary judgment is granted.
IT IS FURTHER ORDERED that plaintiffs' amended complaint is dismissed for failure to plead fraud with particularity.
IT IS FURTHER ORDERED that defendant's counterclaim against plaintiff Schuhardt is dismissed without prejudice.

ORDER OF DISMISSAL
In accordance with the Memorandum and Order entered this same date,
IT IS HEREBY ORDERED that this action is dismissed, pursuant to Federal Rule of Civil Procedure 9(b). The plaintiffs shall bear the costs.
NOTES
[1] Several courts have held that the FCA is not a vehicle for regulatory compliance. See Luckey v. Baxter Healthcare Corp., 2 F.Supp.2d 1034, 1044-1045 (N.D.Ill.1998); United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1267 (9th Cir.1996); United States ex rel. Lamers v. City of Green Bay, 998 F.Supp. 971, 989 (E.D.Wis.1998).
[2] As the Court noted in its August 2002 Memorandum and Order, coverage and payment for Medicare services is administered by the Secretary of the Department of Health and Human Services ("HHS") through the CMS, formerly known as the Health Care Financing Administration ("HCFA") and known before that as the Bureau of Health Insurance.
[3] Plaintiffs rely on the Medicare Carriers' Manual ("MCM") in support of their claim that there was a duty to identify and document in the medical records both the key portions of overlapping surgeries and the physician who was available to take over if an emergency arose during non-key portions. Specifically, plaintiffs cite MCM § 15016.B.3 which explicitly addresses overlapping surgeries. That section of the MCM became effective January 1, 1997 and was not sent out to hospitals until May 1997. Because all of the specific allegations in plaintiffs' complaint fall within the time period before May 1997, it follows that defendant could not have committed fraud by failing to document medical records in conformity with a standard that had not yet been issued.
[4] Defendant stated in its response that it would produce staff by-laws that regulate admitting privileges but that it did not maintain hospital by-laws.
[5] The Court notes that plaintiffs first complained that defendant had not turned over by-laws in their motion to compel filed on June 19, 2002. On August 29, 2002 the Court held a hearing on plaintiffs' motion, and at that hearing informed the parties that it would limit discovery to information surrounding the fifteen patient care cases that were specifically mentioned in the amended complaint. The parties agreed at that time to work together to try to identify the documents that would have to be produced in relation to these fifteen claims, and the Court ordered the parties to file a report on the status of their efforts. On September 9, 2002 plaintiffs filed a document purporting to be a status report, but which the Court construed as yet another motion to compel. Plaintiffs asserted that no agreement could be reached as to how to proceed with the initial phase of discovery, and they again asked the Court to expand the boundaries of the initial phase of discovery. Plaintiffs made no mention of defendant's failure to turn over by-laws, although they did ask that defendant be made to turn over many other documents. On October 7, 2002 defendant made a motion to clarify the Court's September 25, 2002 discovery order, and on October 11, 2002 plaintiffs responded to defendant's motion. Plaintiffs again failed to assert that defendant had failed to turn over by-laws. On November 26, 2002 plaintiffs made yet another motion to expand the first phase of discovery. Plaintiffs made no mention of the need for defendant's by-laws in that motion, although they included in their reply brief, filed on January 6, 2003, the same footnote that appeared in their response to defendant's summary judgment motion, which simply states that defendant has not produced a copy of the hospital's staff by-laws. However, plaintiffs did not address their need for the by-laws in their request for continuance for additional discovery, filed pursuant to Fed.R.Civ.P. 56(f) on February 24, 2003. The Court believes that if plaintiffs truly felt they needed the by-laws to refute defendant's summary judgment motion, they would have stated as much in their Rule 56(f) motion.
[6] Plaintiffs claim that defendant should have reduced its claim for payment when the teaching physician did not provide pre-discharge postoperative care. Plaintiffs believe this to be so even when the teaching physician did provide post-discharge postoperative care.
[7] As noted in the Court's previous opinion, CMS, the entity responsible for developing the details of the Medicare program, contracts with private insurance companies nationwide, known as "carriers," to process claims and to perform payment safeguard functions. To communicate its guidelines to the intermediaries responsible for administering the Medicare program on a daily basis, CMS publishes various manuals, including the MCM.
[8] Defendant contends that the record reflects that the surgeons who provided care to the pre-July 1, 1996 patients provided pre-discharge postoperative services. However, defendant argues that if the Court finds that the pre-discharge postoperative services provided did not comply with the applicable regulations, the surgeons were still entitled to bill the entire global surgical fee because they all provided post-discharge postoperative services to their respective patients. Thus, it is defendant's contention that even if an attending physician did not provide pre-discharge postoperative services, he is still entitled to the global fee because (1) under Medicare's policy, the surgeon is entitled to the entire intraoperative portion of the global fee regardless of whether he provides pre-discharge postoperative care and (2) each surgeon had contact with their patients after discharge, thus, they were entitled to the postoperative portion of the global fee as well.
[9] It is the Court's finding that the Medicare regulations in effect before July 1, 1996 did not dictate that a teaching physician must have been present each time a resident saw a patient postoperatively. Instead, the Medicare regulations dictated that the teaching physician's presence was necessary only if a resident was performing "an identifiable service for which reimbursement was sought." This does not mean that a teaching physician could globally bill Medicare without ever having provided any postoperative care. Rather, the Court believes that the teaching physicians must have ascertained in each specific case the amount of postoperative care that required his or her presence.
[10] The Court's interpretation is similar to the post-July 1, 1996 regulations requiring physician presence at "key" pre-and postoperative services.
[11] Plaintiffs filed their "Summary of Preliminary Findings, Motion to Expand the First Phase of Discovery, and Renewal of Motion to Compel Production of Documents" on November 26, 2002 (Docket entry # 99).
[12] Plaintiffs have not attached any evidence, by way of affidavits from a nurse, another doctor, a resident, etc., which would call into question Dr. Ferguson's assertion that he believed he followed his usual postoperative practices in this instance.
[13] Plaintiffs assert that Dr. Murray was not an attending physician and that he did not have staff privileges at the hospital. According to the declaration of Claudine Ilko, the Administrative Coordinator of the Department of Surgery, Dr. Murray was appointed as an instructor in the Department of Surgery on April 1, 1996. From May 31, 1996 until October 23, 1996, he had temporary privileges at Barnes-Jewish Hospital. Dr. Murray was enrolled as a Medicare provider, and he had his own Medicare provider number throughout the time that he had temporary and permanent privileges at Barnes-Jewish Hospital.
[14] Dr. Cox's presence was indicated by his dictation of the operative note, his signature on the operative note, as well as the operative nurse's note.
[15] Medicare reimburses consultations at varying levels depending on the time spent in the consultation and the quality of care provided during the consultation.
[16] Plaintiffs did allege in their complaint that defendant improperly billed for a consultation with patient G.V., but their allegation was that the consultation was improperly billed because "residents did the surgical consultation which was billed as if Dr. Ferguson had done it." Plaintiffs admit in their summary of preliminary findings that there was evidence in the record showing that Dr. Ferguson performed the surgical consultation. Thus, defendant is entitled to summary judgment on this issue as well.
[17] The record reflects that patient D.L.H. underwent several surgical procedures on 8/27/96, including a fiberoptic bronchoscopy, a mediastinoscopy with biopsy and a left thoracotomy with left lower lobe resection.
[18] The global billing period for major surgeries begins on the day before surgery and continues for the next 90 days. MCM § 4821.E.
[19] Plaintiffs note in their summary that defendant produced letters to referring physicians documenting the results of follow-up visits but did not produce any clinic notes. Dr. Patterson states in his declaration that it was his practice to dictate detailed clinical results in a letter to the referring physician. Dr. Patterson states, "A copy of that letter was maintained in the patient's chart and served as a record of my examination."
[20] Plaintiff testified that she called a government hotline in October 1996 because she believed that defendant was attempting a "cover-up" by going back to get documentation of physician presence on medical charts. Plaintiff did not mention a qui tam action at the time she made the phone call, and she did not tell any of her supervisors about the call. Plaintiff testified that she reported her suspicions with respect to the documentation reviews, and the person she spoke to told plaintiff that she would have to get her own attorney. Around the same time she called the hotline, plaintiff made copies of medical records in medical charts that were in her office for coding and she took the copies home. The Court does not believe that plaintiff's copying of files was "in furtherance of a qui tam action" for two reasons. First, plaintiff testified that she took medical records home "all the time" in performance of her job duties. Second, there is no evidence that defendant knew that plaintiff had copied the files and, hence, no evidence that the defendant knew of any "investigation."
[21] Mr. Gagen testified in his deposition that he did not remember plaintiff Schuhardt ever telling him that billing from the operative notes without having a fully documented file was fraudulent. However, for purposes of the notice analysis, the Court will assume, without deciding, that plaintiff Schuhardt did tell Mr. Gagen that she felt the practice was "illegal" and "fraudulent."
[22] Ms. Sauerburger testified in her deposition that she did not recall Ms. Schuhardt ever making mention of the OIG. However, for the purposes of this notice analysis, the Court will assume, without deciding, that plaintiff Schuhardt did mention the OIG to Ms. Sauerburger.
[23] Ms. Sauerburger also testified that defendant was on heightened awareness at this time of its billing practices due to a lawsuit initiated against the University of Pennsylvania for Medicare fraud. Consultants were hired to review defendant's billing practices around this same time. Specifically, a consulting agency known as Pro-Stat was hired after the new regulations were released in July 1996 to help the coders figure out what documentation was necessary to make a proper Medicare claim. Furthermore, the consulting firm Arthur Anderson was hired at around this same time to internally audit the documentation in the Department of Surgery.
[24] The Department of Surgery had to pass the internal audit with a certain percentage of accuracy before it could start billing Medicare again.
[25] The coders also did this for pre- and post-operative care, consultations, bedside procedures, etc.